Joshua P. Davis (Cal. Bar No. 193254)
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Tel: (415) 906-0684
jdavis@bergermontague.com

Eric L. Cramer (*pro hac vice pending*)
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bergermontague.com

Robert E. Litan (*pro hac vice pending*)
**BERGER MONTAGUE PC**
1001 G Street, NW, Suite 400 East
Washington, DC 20001
Tel: (202) 559-9745
rlitan@bergermontague.com

Edward J. Normand (*pro hac vice pending*)
Richard Cipolla (*pro hac vice pending*)
Stephen Lagos (*pro hac vice pending*)
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th Street, Suite 915
New York, NY 10021
Tel: (646) 494-2900
tnormand@fnf.law
rcipolla@fnf.law
slagos@fnf.law

*Counsel for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TALANOA ILI and CHARLIE MIRER, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ATLANTIC COAST CONFERENCE, BIG TEN CONFERENCE, BIG 12 CONFERENCE, SOUTHEASTERN CONFERENCE, COLLEGE SPORTS COMMISSION, CHARLIE BAKER, JAMES PHILLIPS, ANTHONY PETITTI, GREG SANKEY, BRETT YORMARK, and BRYAN SEELEY, <br><br> Defendants. | **Case No. 3:26-cv-05562** <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

PAGE

I.    Introduction ........................................................................................................... 1

II.   Parties ................................................................................................................. 11

      A.   Plaintiffs ................................................................................................. 11

      B.   Defendants .............................................................................................. 12

III.  Class Allegations ............................................................................................... 16

IV.   Jurisdiction, Venue, and Divisional Assignment .............................................. 19

V.    Factual Allegations ............................................................................................ 37

      A.   History of the NCAA Before the Settlement: Revenue and Restrictions ............. 37

      B.   California's NIL Law and Follow-On Developments ............................. 39

      C.   The *House* Litigation and Settlement ................................................... 42

      D.   The Post-Approval Implementation of the Settlement ........................... 44

VI.   Counts ................................................................................................................ 47

      COUNT I ............................................................................................................ 47

      A.   The Agreement Violates Section 1 of the Sherman Act ......................... 47

           1.   The Relevant Markets ................................................................. 51

           2.   Conference Defendants' Substantial Market Power ................... 54

           3.   Direct Anticompetitive Effects .................................................. 55

      B.   There Are No Procompetitive Justifications ........................................... 56

      COUNT II ........................................................................................................... 62

      COUNT III .......................................................................................................... 62

      COUNT IV .......................................................................................................... 64

      A.   The Prospective Economic Relationships at Issue ................................. 64

      B.   Defendants' Knowledge of the Relationships ........................................ 64

      C.   Civil Conspiracy and Concert of Action Among All Defendants .......... 65

      D.   Intentional Interference ........................................................................... 66

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

E. Independent Wrongfulness ................................................................67

F. Causation and Damages ..................................................................68

G. Individual Defendants' Aiding and Abetting Liability ..........................................68

COUNT V ................................................................................69

VII. Prayer for Relief.................................................................71

VIII. Jury Demand ..................................................................72

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

## I. INTRODUCTION

1. Plaintiff Talanoa Ili is a football player at the University of Southern California ("USC"), and Plaintiff Charlie Mirer is a football player at Stanford University. Plaintiffs bring this action on behalf of four proposed Classes (defined below) of similarly situated Division I college athletes playing football and men's basketball. Defendants are the National Collegiate Athletic Association ("NCAA"), the so-called "Power Four" Division I athletic conferences, the College Sports Commission ("CSC"), and the chief executives of each of these entities. Plaintiffs bring this action to challenge Defendants' unlawful implementation of rules restricting the compensation that these athletes may receive for their name, image, and likeness ("NIL") rights. Plaintiffs seek to recover the damages the conduct challenged herein has caused.

2. The restrictions on these college athletes' NIL rights (the "NIL Restrictions") follow from the Injunctive Relief Settlement ("IRS") included as part of the class action settlement (the "Settlement") this Court approved in *In re College Athlete NIL Litigation*, 803 F. Supp. 3d 959 (N.D. Cal. 2025) (the "*House* Action"). The Settlement did not preempt applicable state law, especially statutes in California and sixteen other states (the "NIL Rights States") prohibiting the restrictions on NIL rights that Defendants ultimately imposed. The IRS also identified the implementation of the NIL Restrictions as distinct from the Settlement itself, affording plaintiffs the ability to seek damages for implementation that violates federal or other laws. That is precisely what Plaintiffs and the members of the proposed Classes do here.

3. More specifically, the NCAA and the other Defendants understood that state laws prohibit the implementation of NIL compensation restrictions set out in the IRS. They thus were aware that Congressional action would be necessary to implement the restrictions in those states. Defendants knew that Congress had not acted to preempt state law, that the Court in *House* declined to find that the settlement preempted state law, and thus that implementing NIL restrictions would violate state laws. Accordingly, the Court did not authorize Defendants' coordinated decision to implement these restrictions in violation of these states' NIL laws (the "Agreement"). If not for the Agreement, there would be vigorous competition in the NIL Rights States to pay college athletes in those states for their NIL rights. The

Agreement has thus unlawfully restrained competition, in violation of federal antitrust law and California state law.

4.     In particular, as shown below, Defendants' implementation of the NIL Restrictions violates Section 1 of the Sherman Act, 15 U.S.C. § 1; the California Cartwright Act, Cal. Bus. & Prof. Code, § 16720 *et seq.*; and the Fair Pay to Play Act, Cal. Educ. Code § 67456. It also constitutes tortious interference with prospective economic advantage under California law. Plaintiffs seek damages arising out of Defendants' illicit conduct, and a limited form of injunctive relief linked only to this new action as set forth herein, not to the IRS.

5.     Plaintiffs propose four Classes, each of which consists of Division I college athletes rostered on a Football Bowl Subdivision ("FBS")[1] football or men's basketball team ("Revenue-Generating College Athletes") in the NIL Rights States at any time during the Class Period, as defined below.

6.     The Classes are: (a) the "Federal Direct Pay NIL Class," or "Class 1," consisting of Revenue-Generating College Athletes on full scholarships who are attending, have attended, or will attend schools[2] that were and continue to be constrained by the NIL Restrictions; (b) the "California Direct Pay NIL Class," or "Class 2," consisting of Revenue-Generating College Athletes on full scholarships who are attending, have attended, or will attend schools in California that were and continue to be constrained by the NIL Restrictions; (c) the "Federal Associated Third-Party NIL Class," or "Class 3," consisting of Revenue-Generating College Athletes on full scholarships who had received NIL compensation prior to June 6, 2025, from Associated Third Parties;[3] and (d) the "California Associated Third-Party NIL Class,"

---

[1] FBS football is the highest tier of college football in Division I, characterized by substantially higher levels of quasi-professional athletic talent, coaching resources, facilities investment, and media exposure than in the NCAA's Football Championship Subdivision ("FCS") or lower divisions of college football. These subdivisions apply only to football; basketball is simply Division I, and colleges compete in NCAA-run championships. NCAA, *Our Division I Story*, https://www.ncaa.org/sports/2021/2/16/our-division-i-story.aspx.

[2] This Complaint uses "schools" to refer to all public and private colleges, universities, and other postsecondary educational institutions, unless the context requires a more specific term.

[3] "Associated Third Parties" are "Associated Entities or Individuals," a term defined in the IRS. *See infra* note 5.

or "Class 4," consisting of Revenue-Generating College Athletes on full scholarships at schools in California who had received NIL compensation prior to June 6, 2025, from Associated Third Parties.

7. Classes 1 and 3 (the "Federal Classes") allege suppressed compensation due to violations of the federal antitrust laws. Classes 2 and 4 (the "California Classes") allege suppressed compensation due to violations of California state antitrust law (the Cartwright Act) and California common law against intentional interference with prospective economic advantage. All of the conduct challenged herein is ongoing and has been harming Class members since June 6, 2025, and will continue to do so until the Agreement is no longer in place (the "Class Period").

8. Defendants fall into two groups: the "Institutional Defendants" and "Individual Defendants." The Institutional Defendants include the NCAA, each of the Power Four athletic conferences, and the CSC. The Power Four conferences are the Atlantic Coast Conference, the Big Ten Conference, the Big 12 Conference, and the Southeastern Conference (the "Conference Defendants"). The Individual Defendants are NCAA President Charlie Baker, the commissioners of each Power Four conference (James Phillips, Anthony Petitti, Brett Yormark, and Greg Sankey, respectively), and CSC Chief Executive Officer Bryan Seeley.

9. On April 21, 2025, the NCAA adopted new rules (the "revised NCAA rules") to implement the NIL Restrictions. On June 6, 2025, with the Settlement approved, the revised NCAA rules became effective in all states. Accordingly, beginning on July 1, 2025, the NCAA authorized Division I schools in all states to begin paying direct NIL compensation subject to the NIL Restrictions.

10. In approving the Settlement, pursuant to which the NCAA and the Power Four conferences created the CSC to enforce the terms of the IRS, the Court specified, and Defendants agreed, that the Settlement did *not* preempt or create any exemption from state NIL laws. Accordingly, the IRS did not require the uniform implementation of the NIL Restrictions. Yet Defendants have implemented the NIL Restrictions authorized by the IRS regardless of the laws in the NIL Rights States, which prohibit the NCAA or its conferences from restricting the exercise of NIL rights or from preventing the payment of

compensation for NIL rights, including the capping of NIL payments. Plaintiffs thus do not challenge the terms of the Settlement or the revised NCAA rules, but rather their *implementation*.[4]

11.     First, the IRS permits, but does not require, each Division I school to opt into a framework under which it may make direct NIL payments to its athletes up to an annual Direct Pay Cap, calculated as 22% of the "Average Shared Revenue" of "Conference Defendant Member Institutions plus Notre Dame." IRS Art. 3, §§ 1(a), 1(d), 1(e). Schools that opt into the IRS framework are subject to the Direct Pay Cap automatically. For the 2025–26 academic year, the Direct Pay Cap is $20.5 million, an amount scheduled to grow each year over the ten-year term of the IRS. Under the NCAA's previous, "interim" NIL policy announced on July 1, 2021, schools could not pay athletes for their NIL rights.

12.     Second, the IRS requires the NCAA to adopt rules allowing college athletes to earn NIL compensation from some third parties without restriction. It also permits, but does not require, Defendants to subject NIL compensation provided by "Associated Entities or Individuals"[5] to certain restrictions discussed below ("Associated Third-Party NIL Compensation Restrictions"). IRS Art. 4, § 3.

---

[4] Plaintiffs' claims in this action, including their claims for injunctive and declaratory relief, do not constitute a challenge to the IRS approved by this Court, including its structure, its terms, or its continuation through June 2035. Plaintiffs do not seek to modify, vacate, disturb, or supersede the IRS or the benefits flowing to settlement class members under the IRS. Plaintiffs' claims arise solely from Defendants' conduct in implementing the IRS in the NIL Rights States in excess of its authorization and in violation of applicable state law, conduct that the IRS does not authorize, require, or protect. The prospective relief Plaintiffs seek, as outlined in detail in Count V, is directed only at Defendants' unlawful implementation conduct and at establishing a process for determining athlete compensation in the NIL Rights States that complies with applicable state law and does not involve horizontal coordination among competing institutions in violation of Section 1 of the Sherman Act. Nothing in this action challenges the lawfulness of the IRS itself or this Court's approval thereof.

[5] Under Article 1, Section 1(c) of the IRS, an Associated Individual or Entity is defined as "(a) [a]n entity that is or was known (or should have been known) to the athletics department staff of a Member Institution, to exist, in significant part, for the purpose of (i) promoting or supporting a particular Member Institution's intercollegiate athletics program or student-athletes; and/or (2) creating or identifying NIL opportunities solely for a particular Member Institution's student-athletes; (b) [a]n individual who is or was a member, employee, director, officer, owner, or agent of an entity described in Section 1(c)(a) above; (c) [a]n individual who directly or indirectly (including contributions by an affiliated entity or family member) has contributed more than $50,000 over their lifetime to a particular Member Institution or to an entity described in Section 1(c)(a) above; (d) [a]n individual or entity that (1) has been directed or requested by a Member Institution's athletics department staff to assist in the recruitment or retention of prospective or current student-athletes, or (2) otherwise has assisted in the recruitment or retention of prospective or current student-athletes; or (e) [a]ny entity owned, controlled, or operated by, or otherwise affiliated with, the individuals or entities described in Section 1(c)(a)–(d) above other than a publicly traded corporation."

4

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

13. The IRS also authorizes, but does not require, the NCAA or the Power Four conferences to create a "Designated Enforcement Entity," independent of the NCAA, to enforce the NIL Restrictions. IRS Art. 1, § 1(h). The IRS does not specify how the NCAA and conferences must implement the new NIL system. Nor does it state that the new system can or should be implemented in states whose laws prohibit its implementation. And in fact, as noted, the Court approved the Settlement on the premise that the Settlement does not preempt state law.

14. On June 6, 2025, the Power Four conferences launched the CSC, which they oversee, as the Designated Enforcement Entity. Along with other Defendants, the NCAA also participated in the design of the CSC and has been involved in the implementation of the revised NCAA rules. The CSC enforces both the Direct Pay Cap and the Associated Third-Party NIL Compensation Restrictions uniformly in all states. The laws in the NIL Rights States, however, prohibit Defendants' implementation of the NIL Restrictions in those states. Defendants' uniform violation of state NIL laws was no accident: before approval, and as detailed below, officials from the Conference Defendants reportedly circulated a draft "affiliation" or "membership agreement" binding schools to enforcement of the NIL Restrictions through CSC and NIL Go, even where state law was contradictory.

15. In 2019, California enacted the first NIL statute in the country. That law, the Fair Pay to Play Act, Cal. Educ. Code § 67456 (the "California NIL Law"), provides in pertinent part that "[a]n athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, shall not prevent a student of a postsecondary educational institution participating in intercollegiate athletics from earning compensation as a result of the use of the student's name, image, likeness, or athletic reputation." *Id.* § 67456(a)(2).

16. The California NIL Law further states: "An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, shall not prevent a postsecondary educational institution from participating in intercollegiate athletics as a result of the compensation of a student athlete for the use of the student's name, image, likeness, or athletic reputation." *Id.* § 67456(a)(3). The California NIL Law

defines "postsecondary educational institution" to include both public and private schools in California. *Id.* § 67456(g).

17. In short, California statutory law prohibits Defendants from: (a) imposing restrictions on NIL compensation; and (b) punishing California schools on account of their athletes receiving NIL compensation. Consistent with the "shall not prevent" mandate in the California NIL Law, Defendants may not use NCAA, conference, or CSC rules or other enforcement mechanisms allowed by the IRS to prevent California athletes from earning NIL compensation. Defendants may not prevent: (a) schools from paying direct NIL compensation to athletes; or (b) third parties from paying NIL compensation to athletes, including Associated Entities or Individuals, through Defendant-imposed reporting, valuation, eligibility, or penalty regimes.

18. The NIL Restrictions, however, impose exactly those limitations: they prevent and deter athletes from earning NIL compensation; pressure athletes and California schools to accept reduced NIL compensation; and threaten athletes' and schools' participation in intercollegiate athletics for engaging in conduct that California law protects.

19. Since the enactment of the California NIL Law, as shown in Appendix A, sixteen (16) other states have enacted statutes that similarly bar the NCAA, athletic conferences, or other groups or organizations with authority over intercollegiate athletics from interfering with college athletes' NIL rights and/or punishing schools in those states on account of their athletes receiving NIL compensation. But for the Agreement, schools and Associated Third Parties in these NIL Rights States would aggressively compete for deals for both "Direct Pay NIL Compensation" and "Third-Party NIL Compensation." Instead, Defendants have pursued a coordinated scheme to implement the NIL Restrictions in the NIL Rights States. In these states, Defendants thus restricted competition among Division I schools and among Associated Third Parties. Defendants knew the Settlement did not preempt state NIL laws, but nevertheless oversaw and furthered the implementation of the NIL Restrictions in the revised NCAA rules as if state laws were preempted. Defendants have thus unlawfully restrained trade in the commercialization of athletes' NIL rights in those states, thereby suppressing athlete NIL compensation below the levels state law entitled those athletes to receive, in violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1, and in violation of California statutory and common law. The Individual Defendants, who directed and approved the Agreement implementing those restrictions, are also liable for that unlawful conduct.

20. The Agreement is unlawful under Section 1 of the Sherman Act because it suppresses NIL compensation through Defendants' price fixing and concerted refusal to deal, or group boycott. It is price fixing because it places a cap on the price and output of NIL compensation by restricting price competition for NIL rights. It is a concerted refusal to deal, or group boycott, with both horizontal and vertical components, as detailed below, because Defendants have collectively conditioned conference affiliation, athlete eligibility, and competitive participation on schools' compliance with the NIL Restrictions, and threatened exclusion of schools and athletes that seek to engage in NIL transactions outside the limits Defendants have collectively imposed. Plaintiffs' claims arise from the application of the NIL Restrictions within the NIL Rights States, where that application violates applicable state and federal law, but the NIL Rights States are not the outer boundary of the conspiracy itself.

21. Defendants' agreement to implement the NIL Restrictions in NIL Rights States is a horizontal agreement among competing buyers that unlawfully suppresses the prices paid to sellers. NIL compensation is not reimbursement for education-related expenses, but rather consists of commercial consideration paid to holders of recognized property rights in their name, image, and likeness. Defendants are horizontal competitors for athlete NIL rights and collectively agreed to cap the compensation paid to those rights-holders below what state law entitled those athletes to receive and below what an unconstrained market would produce.

22. The Agreement has direct anticompetitive effects, including the suppression of NIL compensation below competitive levels. These anticompetitive effects are also evident using indirect means of analysis. The schools implementing the Agreement in the NIL Rights States collectively have market power in the respective markets in which competition would occur but for the Agreement. These are the markets for Direct Pay NIL Compensation and Third-Party NIL Compensation in the NIL Rights States. The Defendants have used that market power to suppress NIL compensation of Plaintiffs and proposed Class members. The Agreement has no procompetitive justifications. It is not necessary to

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

prevent "fake" or "sham" NIL deals, preserve competitive balance among Division I schools, or prevent schools from making improper "inducements" to attract athletes to their programs.

23. The Agreement has also violated California's Cartwright Act and California's NIL Law by suppressing the NIL compensation that members of each of the California Classes would have received both from their schools and Associated Entities or Individuals. Rather than acting independently, Defendants conspired to design, implement, and enforce the NIL Restrictions as a unified regulatory regime, with the common purpose and effect of suppressing NIL compensation of Revenue-Generating College Athletes in California below competitive market levels. The Agreement also constitutes intentional interference with prospective economic advantage under California law.

24. Defendants acted knowingly and intentionally. A combination of facts—including the text of the NIL statutes in the NIL Rights States, many public statements by both the Institutional and Individual Defendants, and representations to this Court during approval of the Settlement—all put Defendants on notice that the Settlement does not preempt state NIL laws. Defendants nevertheless have proceeded as if there were such preemption. The Individual Defendants personally directed and participated in the coordinated scheme and are thus jointly and severally liable under the antitrust laws, and they have aided and abetted the tortious misconduct.

25. Indeed, at the final approval hearing of the Settlement on April 7, 2025, this Court asked whether an athlete could sign an agreement committing to do what state law forbids.[6] The NCAA's counsel responded that the NCAA could "deal with" any "actual" conflict if it arose.[7] Counsel maintained that no conflict had yet been "identified in the existing laws" and that potential conflicts did not justify withholding approval,[8] but the NCAA and Power Four conferences acknowledged in the IRS itself that a new federal statute would be needed to override state NIL laws through the commitment required of Class Counsel to make "reasonable efforts" to support federal or state legislation to accomplish that objective, IRS Art. 7, § 1. This commitment constitutes an admission that the IRS did not preempt state law. And,

---

[6] Transcript of Final Approval Hearing (Apr. 7, 2025) at 222:18–23.

[7] *Id.* at 222:24–25.

[8] *Id.* at 222:25–223:1.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

in approving the Settlement, this Court stated that the Settlement (or "SA") "does not require that this Court find that the SA preempts state laws regarding student-athlete compensation, nor is the Court making such a finding." *Coll. Athlete NIL Litig.*, 803 F. Supp. 3d at 1010.

26. Defendants' own extra-judicial statements confirm that federal legislation would be necessary to preempt state laws that prohibit their desired restrictions on NIL payments. NCAA President Charlie Baker told NCAA members on the day the Court approved the Settlement that states continue to "undercut" one another—in other words, continue to compete with each other over athlete compensation—and that only Congress could override state laws.[9] Big Ten Commissioner Anthony Petitti stated weeks before approval that the conferences were hopeful that the Settlement, with help from Congress, would protect them from competition over athletes. Big 12 Commissioner Brett Yormark acknowledged: "The settlement is one thing, but it needs to be codified on the Hill."[10] Congress has not taken any action on this issue.

27. Plaintiffs are not alone in challenging Defendants' violations of state NIL laws. In mid-November 2025, the CSC and the Power Four conferences attempted to rush through a "University Participation Agreement" ("UPA") by December 3, 2025.[11] The UPA would have exposed Division I schools nationwide to onerous sanctions for violations of CSC rules or for encouraging lawsuits against the CSC by third parties, including students. It would also have stripped schools of their ability to challenge CSC actions in court. A bipartisan group of attorneys general from seven states pushed back in a letter to the CSC dated December 3, 2025 (the "December 2025 Letter"), helping to prevent the UPA from taking effect.[12]

---

[9] *A Letter from NCAA President Charlie Baker*, NCAA (June 6, 2025), https://www.ncaa.org/news/2025/6/6/media-center-a-letter-from-ncaa-president-charlie-baker.aspx.

[10] Heather Dinich, *Power 4 Stakeholders Lobby for NIL Legislation on Capitol Hill*, ESPN (Apr. 9, 2025), https://www.espn.com/college-sports/story/_/id/44608116/with-ncaa-settlement-pending-power-4-stakeholders-lobby-federal-nil-legislation-capitol-hill.

[11] The draft UPA is available at https://businessofcollegesports.com/wp-content/uploads/2025/11/951583495-CSC-University-Participant-Agreement.pdf.

[12] The letter is available at https://www.tn.gov/content/dam/tn/attorneygeneral/documents/pr/2025/pr25-58-letter.pdf. The attorneys general represented the states of Florida, New Jersey, Ohio, Pennsylvania, Tennessee, Texas, and Virginia.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

28. The December 2025 Letter described actions that the CSC and the Power Four conferences had planned to take with respect to public schools. Those actions are, in substance, no different from the Agreement here. As the attorneys general wrote, states had "enacted a variety of NIL statutes to protect student-athlete rights and regulate the conduct of athletic associations."[13] The principle underlying the NIL Rights States' laws is consistent with what is described in the December 2025 Letter: "athletic associations cannot demand that public institutions surrender State-law protections as the price of participation in college athletics."[14] The ordinary operation of federalism, under which states may choose to adopt their own policies in this area, does not insulate Defendants from liability for implementing the IRS in violation of state laws.

29. Paragraph 46 of the Settlement establishes this Court as the mandatory forum for claims based on the implementation of the IRS alleging antitrust or other violations of law by the NCAA and the Conference Defendants, and requires, to the fullest extent legally permissible, that any such claims be asserted in the *House* Action. Plaintiffs intend, promptly upon the assignment of a case number to this action, to move pursuant to Civil Local Rule 3-12 for this case to be considered related to *In re College Athlete NIL Litigation*, Case No. 4:20-cv-03919-CW, and assigned to Judge Claudia Wilken. Plaintiffs seek only post-approval damages arising from Defendants' voluntary implementation of the NIL Restrictions in states where that implementation violates state law; Plaintiffs do not seek to modify, vacate, or enjoin the Settlement.

30. The forum requirement set forth in Paragraph 46 of the Settlement extends to all Defendants. The CSC was created by, and derives its authority entirely from, the IRS, and claims against it arising from IRS implementation fall under Paragraph 46 of the Settlement. The Individual Defendants, acting as agents of their respective institutional defendants, directed and approved the implementing conduct at issue, and are closely related to this dispute, such that enforcement of the forum requirement against them is foreseeable and appropriate.

---

[13] *Id.*

[14] *Id.*

31.   Accordingly, in reliance on that provision and on behalf of the proposed Classes, Plaintiffs seek damages arising from the Agreement in violation of federal antitrust law for the Federal Classes, and of both California's state antitrust law and California's common law of tortious interference with prospective economic relations for the California Classes.

## II.   PARTIES

### A.   Plaintiffs

32.   Plaintiff Talanoa Ili seeks to represent each of the four proposed Classes. He is a scholarship FBS football player enrolled at USC as of January 2026. Ili was a highly recruited football linebacker, with a 4-star rating from major high school athletics ratings organizations. After considering inquiries and offers from multiple top Division I football programs, he decided to attend and play for USC. Ili resides in California.

33.   Ili received numerous honors as a high school football player in both the Los Angeles area, at Orange Lutheran in Orange, California, his freshman through junior years; and at Kahuku High School in Kahuku, Hawaii, his senior year. He was named a MaxPreps All-American in 2024 as a junior and received All-California Interscholastic Federation and All-Trinity California honors in 2022 and 2023. In 2025, he was named the MaxPreps Hawaii State Player of the Year and was selected for the Polynesian Bowl All-Star team.

34.   Before the Settlement's approval, Ili received a substantial multi-year offer from the House of Victory collective associated with USC. That offer disappeared after the Court approved the Settlement, and it has not resurfaced since he signed a commitment on November 7, 2025, to attend and play for USC. Absent the NIL Restrictions on Direct Pay NIL Compensation, Ili would have received more for his NIL rights than he now receives. The Agreement has thus injured Ili.

35.   Ili is one of many college athletes who saw a valuable NIL opportunity disappear after the NCAA and Power Four conferences announced that they would implement the NIL Restrictions uniformly across the country. For the many such athletes who, like Ili, do not come from affluent families, the Agreement denied them NIL opportunities that could have been life-changing. Ili is seeking to help ensure

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

that he and his teammates, and other similarly situated athletes, are free to earn the NIL income that a competitive market would generate.

36. Plaintiff Charlie Mirer seeks to represent the Federal Associated Third-Party NIL Class and the California Associated Third-Party NIL Class. A senior, Mirer is a scholarship FBS football player at Stanford in Palo Alto, California, and he resides in California. As the starting quarterback at Cathedral Catholic High School in Rancho Santa Fe, California, Mirer led his team to three league titles, and as a senior in 2021, to the D1-AA California state championship. The University of Michigan at Ann Arbor, Rice University, San Diego State University, and the University of San Diego recruited Mirer, but he ultimately chose to attend Stanford. He was on full athletic scholarship during the 2025 season.

37. Mirer was named to the Pac-12 Academic Honor Roll in 2023 (as a sophomore). As a backup quarterback at Stanford in 2023 and 2024, the Lifetime Cardinal collective paid him NIL compensation. Under the revised NCAA rules, no collective has compensated Mirer after 2024. In the absence of the NIL Restrictions, Mirer would have been paid by one or more Associated Third Parties for his NIL rights in 2025 and 2026. The Agreement has thus injured him.

38. Mirer relied on NIL income to help him afford to attend Stanford—an extraordinary, but also extraordinarily expensive, school. After the Agreement, his NIL income evaporated. Mirer seeks to ensure that the similarly situated athletes he seeks to represent, whatever schools they attend, are able to pursue their full NIL opportunities to help pay for their education and to earn money for rights that exist for only a short window of time.

**B.  Defendants**

39. Defendant NCAA is an unincorporated association with its principal place of business at 700 West Washington Street, Indianapolis, Indiana. The NCAA has approximately 1,100 member schools across three Divisions. Compared to the NCAA's Division I, its Divisions II and III include schools with much less extensive investments in, and spending on, their athletic programs. For the 2024 fiscal year, the NCAA reported total revenues of $1.38 billion.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

40. In March 2025, the NCAA recognized that, if the Court approved the proposed Settlement, the responsibility for implementation and enforcement would fall primarily to the then "Power Five" conferences and the NCAA. The NCAA has also incorporated the NIL Restrictions into its Manual.

41. During the Class Period, the NCAA and its members facilitated and organized the Agreement with other Division I athletic conferences to implement the revised NCAA rules and impose the NIL Restrictions across the country. Under Article 19 of its Manual, the NCAA has authority to punish schools and athletes for violating NCAA rules, including the NIL Restrictions.

42. Defendant Atlantic Coast Conference ("ACC") is an unincorporated association that maintains its principal place of business in Charlotte, North Carolina. The ACC is a multi-sport collegiate athletic conference and one of the Power Four conferences. For the fiscal year 2024, the ACC's revenues were $711.4 million. During the Class Period, the ACC participated in the Agreement and the implementation of the NIL Restrictions in ways that violate federal and California law as described herein. The ACC is one of the athletic conferences that created and oversees the CSC.

43. The ACC comprises Boston College, the University of California at Berkeley ("UC Berkeley" or "Cal"), Clemson University, Duke University, Florida State University, Georgia Institute of Technology, the University of Louisville, the University of Miami, the University of North Carolina at Chapel Hill, North Carolina State University, the University of Notre Dame (except for football), the University of Pittsburgh, Southern Methodist University, Stanford University, Syracuse University, the University of Virginia, Virginia Polytechnic Institute and State University (Virginia Tech), and Wake Forest University.

44. Defendant Big Ten Conference ("Big Ten") is a nonprofit Delaware corporation that maintains its principal place of business in Rosemont, Illinois. The Big Ten is a multi-sport collegiate athletic conference and one of the Power Four conferences. For the fiscal year 2024, the Big Ten's revenues were $928 million. During the Class Period, the Big Ten participated in the Agreement and the implementation of the NIL Restrictions in ways that violate federal and California law as described herein. The Big Ten is one of the athletic conferences that created and oversees the CSC.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

45. The Big Ten comprises the University of California at Los Angeles ("UCLA"), the University of Illinois at Urbana-Champaign, Indiana University, the University of Iowa, the University of Maryland, the University of Michigan, Michigan State University, the University of Minnesota, the University of Nebraska-Lincoln, Northwestern University, Ohio State University, the University of Oregon, Pennsylvania State University, Purdue University, Rutgers University, the University of Southern California, the University of Washington, and the University of Wisconsin-Madison.

46. Defendant Big 12 Conference ("Big 12") is a nonprofit Delaware corporation that maintains its principal place of business in Irving, Texas. The Big 12 is a multi-sport collegiate athletic conference and one of the Power Four conferences. For the fiscal year 2024, the Big 12's revenues were $494 million. During the Class Period, the Big 12 participated in the Agreement and the implementation of the NIL Restrictions in ways that violate federal and California law as described herein. The Big 12 is one of the athletic conferences that created and oversees the CSC.

47. The Big 12 comprises the University of Arizona, Arizona State University, Baylor University, Brigham Young University, the University of Cincinnati, the University of Colorado Boulder, the University of Houston, Iowa State University, the University of Kansas, Kansas State University, Oklahoma State University, Texas Christian University, Texas Tech University, the University of Central Florida, the University of Utah, and West Virginia University.

48. Defendant Southeastern Conference ("SEC") is a nonprofit corporation that maintains its principal place of business in Birmingham, Alabama. The SEC is a multi-sport collegiate athletic conference and one of the Power Four conferences. For the fiscal year 2024, the SEC's revenues were $840 million. During the Class Period, the SEC participated in the Agreement and the implementation of the NIL Restrictions in ways that violate federal and California law as described herein. The SEC is one of the athletic conferences that created and oversees the CSC.

49. The SEC comprises the University of Alabama, the University of Arkansas, Auburn University, the University of Florida, the University of Georgia, the University of Kentucky, Louisiana State University, the University of Mississippi, Mississippi State University, the University of Missouri,

the University of Oklahoma, the University of South Carolina, the University of Tennessee, the University of Texas, Texas A&M University, and Vanderbilt University.

50. Defendant CSC is organized as a Delaware limited liability company and headquartered in Washington, D.C. The Power Four conferences created (in April 2025), own, and oversee the CSC. The CSC serves as the Designated Enforcement Entity that the NCAA and the Power Four conferences authorized in the IRS to implement and enforce the IRS's provisions, including the revised NCAA rules. The CSC manages NIL Go, its clearinghouse for collecting NIL deals valued at $600 or more, each of which college athletes must report. The CSC uses NIL data submitted to NIL Go to monitor and enforce compliance with the revised NCAA rules embodying the NIL Restrictions. During the Class Period, the CSC implemented the revised NCAA rules as described herein.

51. Defendant Charlie Baker has been the President of the NCAA since March 1, 2023. He resides in Swampscott, Massachusetts, and performs his official duties at the NCAA's headquarters in Indianapolis, Indiana. He is a knowing and willful participant in the conduct that Plaintiffs challenge herein.

52. Defendant Anthony Petitti has been the Commissioner of the Big Ten since May 15, 2023. He resides in Port Saint Lucie, Florida, and performs his official duties at the Big Ten's headquarters in Rosemont, Illinois. He is a knowing and willful participant in the conduct that Plaintiffs challenge herein.

53. Defendant James Phillips has been the Commissioner of the ACC since February 1, 2021. He resides in Huntersville, North Carolina, and performs his official duties at the ACC's headquarters in Charlotte, North Carolina. He is a knowing and willful participant in the conduct that Plaintiffs challenge herein.

54. Defendant Greg Sankey has been the Commissioner of the SEC since June 1, 2015. He resides in Birmingham, Alabama, and performs his official duties at the SEC's headquarters in Birmingham, Alabama. He is a knowing and willful participant in the conduct that Plaintiffs challenge herein.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

55. Defendant Brett Yormark has been the Commissioner of the Big 12 since August 1, 2022. He resides in Dallas, Texas, and performs his official duties at the Big 12's headquarters in Irving, Texas. He is a knowing and willful participant in the conduct that Plaintiffs challenge herein.

56. Defendant Bryan Seeley is the Chief Executive Officer ("CEO") of the CSC. Upon information and belief, he resides in Hoboken, New Jersey. The Power Four conferences selected Seeley as the CSC's inaugural CEO upon final approval of the Settlement. His responsibilities include building out the CSC's investigative and enforcement operations and overseeing implementation of the rules on Direct Pay NIL payments, Associated Third-Party NIL payments, and roster limits under the Settlement. Seeley makes final factual findings and penalty determinations in CSC enforcement actions. He personally helped design and implement the NIL Go clearinghouse and the membership agreements that govern the CSC's authority over schools and athletes. Seeley also played a central role in drafting the UPA and seeking to secure Division I schools' participation in the UPA. Seeley is a knowing and willful participant in the Agreement.

57. Other persons, firms, corporations, organizations, and business entities, some unknown and others known, have participated as unnamed co-conspirators with respect to the Agreement in violation of federal and California law as described in this Complaint.

## III. CLASS ALLEGATIONS

58. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, as a class action on behalf of four Classes.

59. The Federal Direct Pay NIL Class includes all Revenue-Generating College Athletes who during the Class Period received a full athletic scholarship and were on the roster of a Division I school located in an NIL Rights State that: (a) was subject to and bound by the Direct Pay Cap; and (b) in at least one academic year reported total Direct Pay NIL expenditures at the maximum amount permitted by the Direct Pay Cap.

60. The California Direct Pay NIL Class includes all Revenue-Generating College Athletes who during the Class Period received a full athletic scholarship and were on the roster of a Division I school located in California that: (a) was subject to and bound by the Direct Pay Cap; and (b) in at least

one academic year reported total Direct Pay NIL expenditures at the maximum amount permitted by the Direct Pay Cap.

61. The Federal Associated Third-Party NIL Class includes all Revenue-Generating College Athletes on full scholarships who received NIL compensation prior to June 6, 2025, from Associated Third Parties and attended a school subject to NCAA and/or conference NIL rules restricting compensation from Associated Third Parties during the Class Period.

62. The California Associated Third-Party NIL Class includes all Revenue-Generating College Athletes on full scholarships who received NIL compensation prior to June 6, 2025, from Associated Third Parties and attended a school in California subject to NCAA and/or conference NIL rules restricting compensation from Associated Third Parties during the Class Period.

63. On information and belief, there are more than 2,000 members in each of the Federal Direct Pay NIL Class and the Federal Associated Third-Party NIL Class, and more than 400 members in each of the California Direct Pay NIL Class and the California Associated Third-Party NIL Class. The number of members of each proposed Class is so numerous that joinder of all members in the Class would be impracticable.

64. Plaintiff Ili's claims are typical of the claims of the other members of each proposed Class, and Mirer's claims are typical of the claims of other members of the California Classes, because Plaintiffs and such Class members were injured by the same or similar restraints and compensation practices arising out of the Agreement. Football and men's basketball operate under identical NIL restriction frameworks, are subject to the same CSC enforcement mechanisms, and generate comparable NIL market opportunities through their shared status as the primary revenue-generating college sports, all of which makes football players typical for men's basketball players for purposes of this action.

65. As to the Classes, common questions of fact or law exist, and they predominate over any individualized questions. Such common questions include:

      1. For the claims under federal antitrust law:

           A. Whether Defendants engaged in the Agreement;

B. Whether the relevant markets, to the extent they are relevant, consist of the markets for Direct Pay NIL Compensation and Third-Party Compensation in the NIL Rights States;

C. Whether the Agreement is unlawful, because its anticompetitive effects outweigh any legitimate procompetitive justifications;

D. Whether the Agreement caused an antitrust impact and whether that impact was Class-wide;

E. Whether the Agreement caused Plaintiffs and proposed Class members to suffer antitrust injury; and

F. Whether Plaintiffs and the proposed Class are entitled to damages.

2. For the claims under California state law:

A. Whether the Agreement violates the Cartwright Act;

B. Whether the Agreement violates California's NIL Law; and

C. Whether the Agreement constitutes tortious interference with prospective economic relations.

3. For all of the claims:

A. The appropriate Class-wide measure of damages; and

B. The common method for quantifying damages of individual Class members.

66. Plaintiff Ili seeks to represent all of the proposed Classes. Plaintiff Mirer seeks to represent the Federal and California Associated Third-Party NIL Classes. Plaintiffs will fairly and adequately protect the interests of the members of each proposed Class because their interests are all aligned, and Plaintiffs have retained counsel competent and experienced in class action litigation, including complex antitrust litigation and sports-related litigation.

67. A class action is superior to other methods of adjudication. Joinder is impracticable, and the prosecution of separate actions by individual Class members would impose heavy burdens upon the courts and Defendants and create a risk of inconsistent adjudications.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

## IV. JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

68. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5 million exclusive of interest and costs, and in which some of the members of each of the proposed Classes are citizens of a state different from those of Defendants. This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and under Section 4 of the Clayton Act, 15 U.S.C. § 15. The Court has supplemental jurisdiction over the California claims under 28 U.S.C. § 1367.

69. Venue in this Court is proper because Defendants reside, are found, have agents, and transact business in this District. 28 U.S.C. § 1391(b), (c); 15 U.S.C. § 22. Venue in this Court is also proper pursuant to the Settlement.

70. Venue in the San Francisco/Oakland Division of this District is proper on multiple independent grounds. First, Paragraph 46 of the Settlement designates this Court as the mandatory forum for claims arising from implementation of the IRS, and this Court approved the Settlement and has exercised continuing supervisory jurisdiction over the *House* Action since 2020. Assignment to any other division would be inconsistent with that forum-selection provision and would defeat the judicial economy the provision was designed to secure. Second, a substantial part of the events giving rise to Plaintiffs' claims occurred in this Division, including this Court's approval of the Settlement on June 6, 2025, and the subsequent implementation of the NIL Restrictions against California college athletes attending schools whose athletic programs this Court has regulated through the *House* Action. Third, this action is related to *In re College Athlete NIL Litigation*, Case No. 4:20-cv-03919-CW, before the Honorable Claudia Wilken in this Division. The actions involve substantially the same parties, the same transaction and events, and present a substantial risk of conflicting results and duplication of judicial effort if conducted before different judges. Promptly upon the assignment of a case number to this action, Plaintiffs will file an Administrative Motion to Consider Whether Cases Should Be Related, pursuant to Civil Local Rule 3-12; upon entry of the relation order, this action will be assigned to Judge Wilken.

71. This Court has personal jurisdiction over the Institutional Defendants pursuant to Federal Rule of Civil Procedure 4(k) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10.

72.     The Court has specific jurisdiction over the NCAA because Plaintiffs' claims arise directly out of the NCAA's California-directed conduct. The NCAA purposefully directed its post-approval implementation of the NIL Restrictions at California by: (a) adopting revised bylaws on April 21, 2025, which became effective on the day the Settlement was approved, and again on October 28, 2025, as set forth further below, that impose NIL reporting requirements and penalties on athletes and schools nationwide, including in California, with actual knowledge that those rules violated California's Fair Pay to Play Act; (b) designing and deploying the NIL Go clearinghouse in partnership with Deloitte, a national accounting firm, to monitor, review, and suppress NIL transactions involving California college athletes; and (c) sending correspondence to Division I member schools, including California schools, requiring adherence to NCAA rules even where contrary to state law.[15] The NCAA aimed these acts at college athletes in California and caused the resulting harm—namely, the suppression and prevention of NIL compensation owed to California college athletes, all experienced in California.

73.     The ACC and the Big Ten are each subject to specific jurisdiction in this Court because each conference includes California member schools, including Stanford and UC Berkeley in the case of the ACC, and USC and UCLA in the case of the Big Ten. These conferences exercise direct regulatory authority over these California schools. Each of these conferences purposefully availed itself of the privilege of conducting activities in California by: (a) governing, regulating, and imposing obligations on California schools and their athletes; (b) distributing revenue to California member schools and deriving revenue from California markets, including through television contracts covering games played by California schools; (c) participating in the design, creation, and oversight of the CSC as the enforcement entity specifically charged with implementing the NIL Restrictions against California athletes; (d) participating in multiple meetings or presentations at which enforcement of the NIL Restrictions by the

[15] Shehan Jeyarajah, *NCAA Clarifies NIL Policy to Member Schools, Explains Why It Must Be Prioritized Over State Laws, Per Reports*, CBS Sports (June 27, 2023), https://www.cbssports.com/college-football/news/ncaa-clarifies-nil-policy-to-member-schools-explains-why-it-must-be-prioritized-over-state-laws-per-reports/.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

CSC was discussed, with penalties ranging from fines and suspension to expulsion,[16] even though California's NIL Law prohibited such enforcement against California schools or athletes attending them; and (e) circulating and pressing for execution of affiliation agreements and the UPA designed to bind California schools to NIL Restrictions that California law prohibits. Plaintiffs' claims arise out of this California-directed conduct.

74. The Big 12 and the SEC are subject to specific jurisdiction in this Court because each purposefully directed conduct at California in connection with the Agreement. Each of these conferences: (a) participated in the creation, ownership, and oversight of the CSC as a designated enforcement entity whose express function includes imposing the NIL Restrictions on California athletes and their schools; (b) approved and circulated affiliation agreements and the UPA designed to bind all Power Four schools, including California schools, to the NIL Restrictions that California law prohibits; and (c) coordinated with the NCAA, the ACC, and the Big Ten in implementing the revised NCAA rules on a nationwide basis, with actual knowledge that those rules conflicted with California law and would suppress and prevent the NIL compensation of California college athletes. These acts, taken in concert with other Defendants who have direct California ties, constitute purposeful direction of harmful and illicit conduct at California sufficient to support specific jurisdiction.

75. The exercise of personal jurisdiction over the NCAA and the Conference Defendants in this District comports with fair play and substantial justice. California has a compelling sovereign interest in enforcing its laws, including the Fair Pay to Play Act, and in protecting the NIL rights of college athletes at California schools. The Settlement, which all Defendants either negotiated or are bound by as a condition of their participation in the IRS, designates this Court as the exclusive forum for implementation disputes. Defendants cannot on one hand invoke the Settlement as authorization for their conduct and on the other hand contest jurisdiction in the Court that the Settlement designates as the exclusive forum for

---

[16] *See, e.g.*, John Talty, *Commissioners Address* House v. NCAA *Settlement: Donald Trump Meeting, Enforcement Future Among Key Takeaways*, CBS Sports (June 9, 2025), https://www.cbssports.com/college-football/news/commissioners-address-house-v-ncaa-settlement-donald-trump-meeting-enforcement-future-among-key-takeaways/; Eric Olson, *College Sports Commissioners Laud $2.8B Antitrust Settlement, Call for Congress to Act*, Associated Press (June 9, 2025), https://apnews.com/article/ncaa-house-settlement-901a9f15e5f61ef8751a9bf7ab445a6f.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

addressing implementation disputes. Plaintiffs and those Class members who reside and attend school in California have a strong interest in litigating in their home forum. And judicial economy and efficiency strongly favor resolution of these implementation disputes in this Court, which has presided over the underlying litigation since 2020 and possesses unparalleled familiarity with the Settlement and its terms.

76. The Court has personal jurisdiction over Defendant CSC because the Power Four conferences created the CSC to implement and enforce the NIL Restrictions embodied in the IRS on a nationwide basis, including in California, and the CSC has purposefully directed its enforcement activities at California by: (a) operating the NIL Go clearinghouse, which reviews, delays, and, in some cases, suppresses NIL transactions entered into by college athletes attending Division I schools in California, including Plaintiffs and members of the proposed Classes; (b) subjecting those California-based athletes and their schools to its investigative and penalty regime, including threats of fines, athlete ineligibility, and loss of postseason participation; and (c) circulating and seeking execution of the UPA, which was designed to bind California schools, including USC, UCLA, Stanford, and UC Berkeley, to CSC enforcement authority, requiring those schools to act in violation of California's NIL Law. These acts were aimed at California and at California college athletes, whose NIL rights under California law the CSC's enforcement regime was designed to suppress.

77. This Court has personal jurisdiction over the Individual Defendants pursuant to Federal Rule of Civil Procedure 4(k) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10. The exercise of jurisdiction over each Individual Defendant comports with due process because each purposefully, willfully, and intentionally directed tortious conduct at California, and Plaintiffs' claims arise out of that California-directed conduct. The Individual Defendants, who collectively oversee organizations generating billions of dollars in annual revenue from California markets, cannot credibly claim that defending this action in this District imposes an undue burden.

78. This Court has personal jurisdiction over Defendant Charles Baker because he personally directed and oversaw conduct intentionally aimed at California that he knew would suppress and prevent the NIL compensation of college athletes attending Division I schools in this state, in violation of California's Fair Pay to Play Act.

79. In June 2023, Baker sent a letter to all Division I member schools, including California schools USC, UCLA, Stanford, and UC Berkeley, requiring them to adhere to NCAA rules even where those rules conflicted with California state law.[17] Baker directed that letter at California schools and designed it to override California's NIL Law. Publicly characterizing state NIL laws that protect athletes, Baker stated: "They say screw the NCAA. Screw the conference. Screw their rules."[18]

80. Baker knew that California had enacted the Fair Pay to Play Act, one of the first and most comprehensive state NIL laws in the country, and that California schools were subject to that law. The June 2023 letter was designed to require California schools to subordinate their obligations under California law to NCAA rules Baker knew conflicted with it. Baker's direction of that letter towards California schools, and his design of the enforcement apparatus subsequently implemented through the CSC to apply to those schools, constitute purposeful availment of California as a forum and his express aiming of his conduct at that state.

81. In 2024, Baker stated, with reference to the then pending *House* Settlement: "The need for Federal legislation to provide solutions remains. If Congress does not act, the progress reached through the settlement could be significantly mitigated by state laws and continued litigation."[19] This public acknowledgment confirms that, prior to implementation of the NIL restrictions, Baker knew that the revised NCAA rules conflicted with California's NIL Law absent federal preemption that has never materialized.

82. As NCAA President, Baker played a central role in designing the CSC as the enforcement entity for the IRS. On information and belief, Baker oversaw the NCAA's engagement with Deloitte to

---

[17] Steve Berkowitz & Paul Myerberg, *NCAA Sets up Confrontation with State Lawmakers Concerning NIL Guidelines*, USA Today (June 27, 2023), https://www.usatoday.com/story/sports/college/2023/06/27/ncaa-nil-lawmakers-guidelines-confrontation/70360959007/.

[18] Eric Prisbell, *How New State Laws May Impact NCAA's Pursuit of a Federal NIL Bill* (June 9, 2023), https://www.on3.com/nil/news/how-new-state-laws-may-affect-the-ncaas-pursuit-of-a-federal-nil-bill-charlie-baker/.

[19] Jesse Dougherty, *With NCAA Settlement Filed, Schools Move Closer to Paying Athletes*, Wash. Post (July 26, 2024), https://www.washingtonpost.com/sports/2024/07/26/house-v-ncaa-settlement/.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

build the NIL Go clearinghouse used to monitor and suppress NIL transactions involving California athletes. Baker personally directed the adoption of revised NCAA bylaws on April 21, 2025, and again on October 28, 2025, as set forth below, implementing the NIL Restrictions applicable to California schools and athletes.

83. On June 6, 2025, the day the Court approved the Settlement, Baker told NCAA members that states continue to "undercut one another" by competing with each other on NIL rights, and that "only Congress can address these issues."[20] In making this statement, Baker admitted that he knew California's NIL Law conflicted with the Settlement and that implementation of the NIL Restrictions in California required federal preemption that did not exist and has never materialized.

84. Baker's job required familiarity with state NIL laws, and he knew the nature of California's NIL Law, especially as it was the first state NIL law passed in the country. Baker knew that implementing the revised NCAA rules in California contravened California's Fair Pay to Play Act and would harm California college athletes by suppressing and preventing their NIL compensation. His public statements, described above, are also proof of that knowledge.

85. Plaintiffs' claims arise directly out of Baker's California-directed conduct. The suppression and prevention of NIL compensation suffered by Plaintiffs and Class members is a direct and proximate result of Baker's direction and oversight of the NCAA's and other Defendants' implementation of the NIL Restrictions against California schools and athletes.

86. As NCAA President, Baker voluntarily took actions targeting California schools and their athletes. California has a compelling interest in enforcing its Fair Pay to Play Act against those who knowingly violate it. Any burden on Baker of litigating in California is substantially mitigated by the fact that his institution, the NCAA, itself designated this Court as the exclusive forum for implementation of disputes arising out of the Settlement.

87. This Court has personal jurisdiction over Defendant Anthony Petitti because he personally directed intentional conduct aimed at California that he knew would suppress and prevent the NIL compensation of California college athletes in violation of California law.

---

[20] *Supra* note 9.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

88.     In November 2023, Petitti submitted written responses to questions posed by the Chairman of the Senate Judiciary Committee in which he criticized state NIL laws that "explicitly say that the NCAA or conferences cannot penalize institutions for violations of NIL policies, and this includes the role and relationship of collectives to universities."[21] This statement demonstrates Petitti's actual knowledge of the precise category of state NIL laws, including California's NIL Law, that prohibited the enforcement regime he was working to implement.

89.     California enacted the nation's first college athlete NIL statute in 2019, and the prohibition on conference enforcement of NIL restrictions first legislated in California is precisely what Petitti described to the Senate Judiciary Committee as an obstacle to his agenda. Petitti cannot credibly claim ignorance of California law in this respect: California's NIL Law was nationally covered legislation that was tracked by every Power Four conference office from the moment of its enactment. By November 2023, moreover, USC and UCLA had already been announced as incoming Big Ten members. The integration of these two California schools into the Big Ten, for which Petitti as Commissioner bore direct responsibility, necessarily required his office to analyze California's NIL Law and its implications for Big Ten enforcement authority over those schools. The Big Ten's own compliance and legal staff would have briefed Petitti on California law as a standard element of that integration process. Regardless, Petitti's Senate letter reflects not merely constructive awareness of California's law, but actual knowledge in that he described to Congress the operative mechanism of California's NIL Law, including conference enforcement prohibitions extending to third-party collectives, in terms that specifically track the California NIL Law's provisions. Petitti's November 2023 statement, made less than two years before the Settlement was approved, confirms that he knew the NIL Restrictions he was helping to implement conflicted with California law before he took the specific California-directed acts alleged below.

90.     Before approval of the Settlement, the Big Ten was among the Power Four conferences that participated in circulating a draft affiliation agreement to their member schools, including Big Ten members USC and UCLA, as part of a coordinated effort to bind all Power Four schools to the

_____
[21] Letter from Anthony Petitti, Big Ten Commissioner, to Richard J. Durbin, Chairman S. Judiciary Comm. 4 (Nov. 7, 2023), available at https://www.judiciary.senate.gov/download/2023-10-17-qfr-responses-petitti.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

implementation of the Settlement's enforcement policies despite the conflict with California law.[22] Petitti approved, directed, or oversaw the Big Ten's participation in this coordinated effort with knowledge (established by his own public statements) that state NIL laws including California's constrained the enforcement authority the Agreement sought to impose.

91. After approval of the Settlement, the CSC circulated an updated draft affiliation agreement called the UPA as the operational mechanism of the new enforcement structure. On December 3, 2025, a multistate coalition of state attorneys general sent a formal letter to the Individual Defendants, including Petitti, challenging the UPA as unlawful.[23] The letter described the UPA as prohibiting member schools from suing the CSC, assisting others in bringing suits against it, providing testimony adverse to it, or advocating for legal changes inconsistent with CSC rules; and as authorizing sanctions, including loss of conference revenue and postseason bans, against any school that encouraged or voluntarily cooperated in covered litigation. Petitti's receipt of that letter as a named addressee confirms that he had actual knowledge, as of December 3, 2025, of the UPA's specific enforcement provisions and of the determination of the attorneys general that those provisions unlawfully coerced member schools—including USC and UCLA, Big Ten schools located in California—into causing California athletes to surrender legal rights that California law protects.

92. Notwithstanding that formal governmental notice, Petitti publicly expressed support for the CSC and its ongoing compliance and enforcement process, while seeking modifications to it, after receiving the letter from the state attorneys general.[24] That expression of support was not made in a vacuum: Petitti made it with actual knowledge, confirmed by the letter he had just received, that the CSC's

---

[22] Ross Dellenger, *Power Conferences Working on Contract to Bind Schools to New Enforcement Rules, with Strict Punishments*, Yahoo! Sports (May 19, 2025), https://sports.yahoo.com/college-football/breaking-news/article/power-conferences-working-on-contract-to-bind-schools-to-new-enforcement-rules-with-strict-punishments-005652210.html.

[23] *Supra* note 12.

[24] As Petitti said: "I just want to be really clear, because I've seen some reports and I've seen some people say that you're breaking this rule or that rule. We've put in virtually more deals [to the CSC] than anybody. We're doing what we're supposed to do: put the deals in, get the results." Brandon Marcello, *Big Ten Explores Self-Governance as College Sports Commission Sputters, Congress Action Stalls*, CBS Sports (May 20, 2026), https://www.cbssports.com/college-football/news/big-ten-self-governance-college-sports-commission-congress-nil/.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

enforcement mechanisms were directed at California member schools USC and UCLA and were coercing those schools into suppressing and preventing athlete NIL compensation below what California law entitled those athletes to receive. His public acknowledgement of that structure, made with that specific knowledge, constituted a deliberate continuation of California-directed conduct. Petitti took no steps following that formal governmental notice to withdraw the Big Ten from the CSC enforcement structure, to seek modification of its California-conflicting provisions, or to protect USC and UCLA athletes from enforcement actions California law prohibited.

93. Plaintiffs' claims arise out of and relate to Petitti's California-directed conduct as alleged above. The exercise of jurisdiction over Petitti is reasonable. The Big Ten includes USC and UCLA as California member schools, and Petitti directed conduct targeting those schools and their athletes. California has a sovereign interest in adjudicating claims that Defendants deliberately overrode California law to suppress the NIL compensation of California athletes. Petitti implemented the Settlement as the Big Ten's agent and in that capacity is closely related to the Big Ten's contractual commitments under the Settlement, including the designation in the Settlement of this Court as the exclusive forum for matters arising from implementation of the IRS. Litigating Petitti's conduct in any other forum would require duplicative proceedings on claims that are factually inseparable from those against the Big Ten itself.

94. This Court has personal jurisdiction over Defendant James Phillips because he personally directed intentional conduct aimed at California that he knew would suppress the NIL compensation of California college athletes in violation of California's NIL law.

95. In July 2023, Phillips publicly stated his desire for "preempting the patchwork of inconsistent state laws through federal legislation."[25] He acknowledged that "state NIL laws" had "paralyzed the enforcement staff" and left them unsure about whether they were permitted to enforce NCAA restrictions on "inducements and pay-for-play" only "to the extent possible within current state NIL laws."[26] Phillips cannot credibly claim ignorance of California's NIL Law when he made these

---

[25] *Everything Commissioner Jim Phillips Had to Say at ACC Kickoff Tuesday*, JerryRatcliffe.com (July 25, 2023), https://jerryratcliffe.com/everything-commissioner-jim-phillips-had-to-say-at-acc-kickoff-tuesday/.

[26] *Id.*

statements. California enacted the nation's first college athlete NIL statute in 2019, the statute whose precise enforcement-prohibition mechanism Phillips described to the public as paralyzing NCAA enforcement, and that law was tracked by every Power Four conference office from the moment of its enactment. More specifically, Phillips made these statements on July 25, 2023, days before the ACC formally announced the addition of Stanford and UC Berkeley as incoming conference members in August 2023. Negotiations regarding that expansion were already well underway when Phillips spoke publicly about the need to preempt state NIL laws. His office was therefore actively analyzing California's NIL Law and its implications for ACC enforcement authority at the precise moment he identified state NIL laws as an obstacle to the enforcement regime he was working to implement. Phillips's knowledge of California's NIL Law accordingly was based on specific operational knowledge of a law his conference was imminently required to navigate as a direct consequence of its planned expansion into California.

96.     Before approval of the Settlement, the ACC under Commissioner Phillips was among the Power Four conferences that participated in circulating a draft affiliation agreement to their respective member schools as part of a coordinated effort to bind all Power Four schools, including ACC members Stanford and UC Berkeley, to the Settlement's enforcement policies despite the conflict with California law.[27]

97.     After Settlement approval, in his capacity as ACC Commissioner, Phillips co-created and has overseen the CSC, the enforcement entity through which the Power Four conferences collectively implement the NIL Restrictions against California schools and athletes, including the ACC member schools Stanford University and UC Berkeley. The CSC, acting as the operational arm of the conferences, and which Phillips helped create and continues to oversee, circulated the draft UPA as the mechanism for enforcing those restrictions against member schools. On December 3, 2025, a multistate coalition of state attorneys general sent a formal letter to the Individual Defendants, including Phillips, challenging the UPA as unlawfully coercing member schools, including ACC schools Stanford and UC Berkeley, into causing California athletes to surrender legal rights that California law protects.[28]

---

[27] *Supra* note 22.

[28] *Supra* note 12.

98. Phillips directed and participated in developing the CSC's enforcement framework with actual knowledge, confirmed by the letter addressed to him by name from the state attorneys general, that the CSC's enforcement mechanisms were directed at Stanford and UC Berkeley and were coercing those schools into suppressing college athlete NIL compensation below what California law entitled those athletes to receive. Phillips took no steps following that formal governmental notice to withdraw the ACC from the CSC enforcement structure, to seek modification of its California-conflicting provisions, or to protect Stanford and UC Berkeley athletes from enforcement actions California law prohibited. To the contrary, Phillips directed and oversaw the ACC's continued participation in the Agreement, including the implementation of the NIL Restrictions against athletes at Stanford and UC Berkeley.

99. Phillips's own public statements confirm that he knew state NIL laws, including California's, conflicted with the NIL Restrictions he was working to implement, and that lawfully imposing those restrictions in states with protective NIL statutes required federal preemption legislation. No such legislation existed when Defendants acted, nor does it exist now.

100. Plaintiffs' claims arise out of and relate to Phillips's California-directed conduct. The exercise of jurisdiction by this court is reasonable, since the ACC includes Stanford and UC Berkeley as California member schools, and Phillips directed conduct specifically targeting those schools and their athletes. California has a compelling sovereign interest in adjudicating claims that Defendants deliberately overrode its NIL law to suppress the compensation of California athletes. Phillips implemented the Settlement as the ACC's agent and in that capacity is closely related to the ACC's contractual commitments thereunder, including the designation of this Court in the Settlement as the exclusive forum for matters arising from implementation of the IRS. Litigating Phillips's conduct separately from that of the ACC and the other Conference Defendants would require duplicative proceedings on claims that are factually inseparable.

101. This Court has personal jurisdiction over Defendant Greg Sankey because he personally directed the creation and operation of the CSC, the enforcement body through which the Power Four conferences collectively implement the NIL Restrictions against California schools and athletes, with

actual knowledge that those restrictions conflicted with California law. Sankey also approved and oversaw the SEC's participation in a coordinated scheme aimed at binding California schools to those restrictions.

102. At a media day in July 2023, Sankey identified NIL as "a difficult issue . . . dating back to 2019" and described the "patchwork of state laws" as "the most ineffective way" to approach NIL.[29] California enacted the nation's first college athlete NIL statute in 2019, the foundational law in the patchwork Sankey described, and its prohibition on conference enforcement of NIL restrictions against California athletes is precisely the category of state constraint Sankey identified as preventing a uniform enforcement standard. Sankey's statement reflects actual awareness that state NIL laws, including California's, constrained the enforcement authority he was working to consolidate. His characterization of those laws as part of an ineffective patchwork, rather than as legitimate legal constraints on conference authority, confirms that he understood his enforcement agenda conflicted with them and proceeded regardless.

103. In July 2023, Sankey publicly acknowledged that "[t]he reality is[] only Congress can fully address the challenges facing college athletics. The NCAA cannot fix all of these issues, the courts cannot resolve all of these issues. The states cannot resolve all of these issues, nor can the conferences."[30]

104. Before Settlement approval, the Power Four conferences, acting in coordination, created the CSC as their joint enforcement arm. Sankey was among the principal architects of that structure. The CSC's enforcement authority extends by design to all Power Four schools, including the California member schools of the ACC and Big Ten, and Sankey directed its creation with knowledge that it would be used to enforce NIL restrictions against California athletes in conflict with California law.

105. After Settlement approval, in his capacity as the SEC's Commissioner, Sankey helped establish and has overseen the CSC, the enforcement entity through which the Power Four conferences collectively implement the NIL Restrictions. The CSC, acting as the operational arm of the conferences,

---

[29] John Clay, *Everything Commissioner Greg Sankey Had to Say at SEC Football Media Days*, Lexington Herald Leader (July 18, 2022), https://www.kentucky.com/sports/spt-columns-blogs/sidelines-with-john-clay/article263581903.html.

[30] Heather Dinich, *SEC's Greg Sankey: 'Only Congress' Can Resolve NIL Issues*, ABC News (July 21, 2023), https://abcnews.go.com/Sports/secs-greg-sankey-congress-resolve-nil-issues/story?id=101347934.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

circulated the draft UPA as the mechanism for enforcing those restrictions against all member schools, including the California member schools of the ACC and Big Ten, thereby continuing to direct the California-targeted enforcement structure Sankey helped create. On December 3, 2025, a multistate coalition of state attorneys general sent a formal letter to the Individual Defendants, including Sankey, challenging the UPA as unlawfully coercing member schools into causing California athletes to surrender legal rights that California law protects. Notwithstanding that formal governmental notice, Sankey took no steps to withdraw the SEC from the CSC enforcement structure, to seek modification of its California-conflicting provisions, or to protect California athletes from enforcement actions California law prohibited. To the contrary, Sankey continued to co-own and oversee the CSC enforcement structure whose operations target California schools and athletes, with actual knowledge, confirmed by the December 2025 Letter, that those operations unlawfully coerce California schools into suppressing athlete NIL compensation below what California law entitles those athletes to receive.

106. Plaintiffs' claims arise out of and relate to Sankey's California-directed conduct as alleged above. The exercise of jurisdiction is reasonable. Sankey personally directed the creation of the CSC enforcement structure whose operations target California schools and athletes, received formal governmental notice that those operations unlawfully coerce California schools into surrendering rights California law protects, and continued overseeing that enforcement notwithstanding that notice. California has a compelling sovereign interest in adjudicating claims that Defendants knowingly coordinated conduct to override the Fair Pay to Play Act and suppress the NIL compensation of California athletes. Sankey implemented the Settlement as the SEC's agent and is involved in the SEC's contractual commitments thereunder, including the designation of this Court in the Settlement as the exclusive forum for matters arising from implementation of the IRS. Litigating Sankey's conduct separately from that of the other Conference Defendants and commissioners would require duplicative proceedings on claims that are factually inseparable.

107. This Court has personal jurisdiction over Defendant Brett Yormark because he approved, directed, or oversaw the Big 12's participation in the coordinated scheme to implement the NIL

Restrictions in California, with actual knowledge that those restrictions conflicted with California law and required federal preemption that did not occur.

108. In April 2024, Yormark publicly stated: "We need Congressional help, no question about it. We need federal pre-emption of state laws so that, ultimately, we have uniformity across all the different states and how they interpret NIL."[31] This statement acknowledges that state NIL laws, including California's, required federal preemption before the implementation Yormark sought could lawfully proceed. Yormark participated in the implementation of those restrictions in California without such preemption.

109. Several weeks before the Settlement was approved, Yormark stated that the Settlement "is one thing, but it needs to be codified on the Hill,"[32] further confirming his knowledge that the Settlement alone was insufficient to lawfully override California's NIL Law.

110. In 2023, before implementation of the Settlement, Yormark acknowledged that NCAA NIL rules were colliding with state NIL laws. When prompted by the statement, "[l]egal experts tell me that state law would trump NCAA rules," he responded: "I'm going to speak [in this interview] to the conference. And from my perspective, our members have got to adhere to NCAA policy. That would be my guidance—100%."[33] This statement establishes that Yormark, having been told by an interviewer that state law would override NCAA rules, directed conference members to disregard state law protections regardless. Yormark extended this posture through his participation in the coordinated scheme among the Defendants that applied those same directives to California schools in other conferences.

111. Before approval of the Settlement, the Big 12 was among the Power Four conferences that participated in a coordinated effort to circulate a draft affiliation agreement binding all Power Four schools to the Settlement's enforcement policies despite their conflict with state NIL laws. Yormark approved and

---

[31] Ed Dixon, *Big 12 Commissioner Brett Yormark on the Future of College Sports* (Apr. 11, 2024), https://www.sportspro.com/interviews/insights/big-12-brett-yormark-interview-college-sports-ncaa-nil-tv-rights-espn-fox/.

[32] *Supra* note 10.

[33] Eric Prisbell, *Brett Yormark: Big 12 Conference Schools Must 'Adhere' to NCAA NIL Policy*, On3 (July 13, 2023), https://www.on3.com/nil/news/brett-yormark-big-12-conference-schools-must-adhere-to-ncaa-nil-policy/ (alteration in original).

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

directed the Big 12's participation in that coordinated effort with knowledge, established by his own public statements, that the scheme was designed to override state NIL laws, including California's, and that its enforcement reach extended through the CSC to all Power Four schools regardless of conference membership.

112. Following Settlement approval, in his capacity as Big 12 Commissioner, Yormark co-created and has overseen the CSC, the enforcement entity through which the Power Four conferences collectively implement the NIL Restrictions. The CSC, acting as the operational arm of the conferences, and which Yormark helped create and continues to oversee, circulated the draft UPA as the mechanism for enforcing those restrictions against all member schools, including the California member schools of the ACC and Big Ten. On December 3, 2025, a multistate coalition of state attorneys general sent a formal letter to the Individual Defendants, including Yormark, challenging the UPA as unlawfully coercing member schools into causing California athletes to surrender legal rights that California law protects. Yormark's receipt of that letter confirmed, in the form of formal governmental notice, what his own prior public statements had already established: California law prohibited the NIL Restrictions he was implementing, and Congressional preemption of California law had not occurred and was legally necessary before those restrictions could lawfully apply in California. Notwithstanding that formal governmental notice, Yormark took no steps to withdraw the Big 12 from the CSC enforcement structure, to seek modification of its California-conflicting provisions, or to protect California athletes from enforcement actions California law prohibited. To the contrary, Yormark continued to co-own and oversee the CSC enforcement structure whose operations target California schools and athletes, with actual knowledge, confirmed both by his own prior statements and by the December 2025, that those operations unlawfully coerce California schools into suppressing athlete NIL compensation below what California law entitles those athletes to receive.

113. Yormark's public statements establish a consistent pattern: he acknowledged that state NIL laws would prevail over NCAA rules, called for federal preemption as a legal prerequisite to implementation, acknowledged weeks before Settlement approval that the Settlement alone was

insufficient to override state law, and then proceeded to implement the NIL Restrictions against California athletes through the CSC without obtaining the preemption he had publicly identified as necessary.

114. The exercise of jurisdiction is reasonable. Yormark co-created and oversees the CSC enforcement structure whose operations are directed at California schools and athletes, received formal governmental notice that those operations unlawfully coerce California schools, and continued overseeing that enforcement notwithstanding that notice. California has a compelling sovereign interest in enforcing the Fair Pay to Play Act against those who knowingly coordinate violating the law, and Yormark signed the Settlement, which includes Paragraph 46 designating this Court as the exclusive forum for matters relating to the Settlement, a provision of which Yormark would have been aware as Commissioner of the Big 12.

115. This Court has personal jurisdiction over Defendant Bryan Seeley because, as CEO of the CSC, he has personally designed, built, and operated the enforcement regime specifically targeting California athletes and schools, with full and actual knowledge that it conflicts with California's Fair Pay to Play Act.

116. As CEO of the CSC, Seeley personally designed and implemented the NIL Go clearinghouse and the membership agreements governing the CSC's authority over schools and athletes, including California schools and their athletes. NIL Go operates as a centralized gatekeeping mechanism that subjects NIL transactions involving California athletes to after-the-fact scrutiny, valuation challenges, and threatened penalties, thereby suppressing NIL activity that California law protects.

117. Seeley personally oversees the CSC's investigative and enforcement operations, including making final factual findings and penalty determinations in CSC enforcement actions against schools and athletes, including USC, UCLA, Stanford, and UC Berkeley as well as athletes attending those schools.

118. In November 2025, Seeley personally prepared and caused the CSC to circulate the UPA, which would have obligated all Power Four schools, including California schools, not to "encourage or assist" any party, including their state's attorney general, in filing lawsuits against the CSC, on pain of

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

losing at least one year of conference revenue and postseason eligibility in any sport involved in the dispute.[34]

119. Seeley acted with full knowledge that implementation of the IRS conflicts with California's NIL Law. As the operational head of the CSC, the entity whose express and sole function is to enforce the NIL Restrictions challenged in this action, Seeley purposely directed enforcement of the NIL Restrictions at California schools and athletes. Seeley assumed his role as CEO of the CSC after: (a) this Court declined to make any finding that the Settlement preempted state NIL laws; and (b) the Individual Defendants and the NCAA had publicly acknowledged, on multiple occasions, that the Settlement's NIL Restrictions required federal preemption of state laws such as California's Fair Pay to Play Act in order to be lawfully implemented. Seeley built and operates an enforcement apparatus that he knew would be directed at California schools and athletes, in a state whose NIL law he knew prohibited the enforcement he was implementing.

120. Plaintiffs' claims arise directly from Seeley's personal design and operation of the CSC enforcement regime against California athletes. The exercise of jurisdiction is reasonable. Seeley's sole institutional function is to enforce rules that, as applied in California, conflict with California law, making this Court the natural and appropriate forum for claims arising from that enforcement. California has a compelling sovereign interest in adjudicating claims that Seeley personally designed and operates an enforcement apparatus to override the Fair Pay to Play Act and suppress the NIL compensation of California athletes. The CSC was created by and derives its entire authority from the Settlement, and Seeley as its CEO is involved in the Settlement's contractual commitments thereunder, including the designation in the Settlement of this Court as the exclusive forum for matters arising from implementation of the IRS. Litigating Seeley's conduct separately from that of the CSC and the Conference Defendants would require duplicative proceedings on claims that are factually inseparable from those against every other Defendant in this action.

121. In addition to the Defendant-specific bases set forth above, each Individual Defendant is subject to personal jurisdiction in this Court on the following independent and overlapping grounds.

_____

[34] *Supra* note 11.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

122.    First, each Individual Defendant participated in a common scheme, coordinated with the NCAA, the Power Four conferences, and the CSC, to implement the NIL Restrictions in California with knowledge that the NIL Restrictions conflicted with California's Fair Pay to Play Act. Under the co-conspirator basis for personal jurisdiction, acts taken in the forum state by co-conspirators in furtherance of a common scheme are attributable to each participant for jurisdictional purposes. Multiple co-conspirators, including the Big Ten, the ACC, the NCAA, and the CSC, have direct, substantial contacts with California through their California member schools, licensing arrangements, and enforcement operations directed at California athletes. The SEC and Big 12 maintain enforcement relationships with the CSC that extend to California schools, and Sankey and Yormark co-created and continue to direct an enforcement body whose California reach constitutes their forum contact for purposes of this action. Acts taken in California in furtherance of the common scheme attributable to each Individual Defendant include the implementation of the NIL Restrictions against California schools, the operation of NIL Go as to California athletes, and the suspension of operations by UC Berkeley's NIL collective following Settlement approval in direct response to CSC enforcement activity. Additional acts in California in furtherance of the scheme are within the exclusive knowledge of Defendants and subject to further development in discovery.

123.    Second, each Individual Defendant either negotiated the Settlement, leads an institution that negotiated or is functionally bound by it as a condition of participation in the IRS, or, in the case of Seeley, leads an entity whose entire existence, authority, and operational mandate derive from the Settlement itself. The Settlement designates this Court as the exclusive forum for all claims alleging violations of law arising from Defendants' implementation of the IRS. Each Individual Defendant may invoke the Settlement as the authorization for the conduct challenged in this action. No Individual Defendant, however, can reasonably invoke that authorization while simultaneously contesting jurisdiction in the court the Settlement designates as the exclusive implementation forum. The Individual Defendants are equitably bound by the forum designation contained in the Settlement.

124.    Third, the exercise of personal jurisdiction over each Individual Defendant is reasonable and comports with fair play and substantial justice. California has a compelling sovereign interest in

enforcing the Fair Pay to Play Act and ensuring that the NCAA, athletic conferences, and their leaders do not override that statute's protections for California college athletes. Plaintiffs are California residents attending California schools who train and compete in California and earned, or would have earned, NIL compensation in California. Plaintiffs have a strong and concrete interest in litigating in the forum whose law they seek to enforce.

125. Fourth, this Court possesses unique and unparalleled familiarity with the Settlement and its implementation, having presided over the underlying litigation since 2020, approved the Settlement following extensive proceedings, and expressly declined to find that the Settlement preempted state NIL laws. No other forum could adjudicate these claims with comparable efficiency or institutional knowledge. The Individual Defendants, who collectively oversee organizations generating billions of dollars in annual revenue from California markets and have repeatedly availed themselves of this Court's jurisdiction in connection with the underlying Settlement proceedings, face no undue burden in defending this action in this District. Seeley, as CEO of the CSC, an entity created by, operating under, and subject to the continuing supervision of this Court through the Settlement, has been subject to this Court's jurisdiction from the moment he assumed his role. He cannot credibly claim that litigating before the court that oversees the very enforcement regime he operates imposes any burden at all.

## V. FACTUAL ALLEGATIONS

### A. History of the NCAA Before the Settlement: Revenue and Restrictions

126. The association now known as the NCAA was formed in 1906 as a rulemaking body aimed at protecting the health and safety of college football players.[35] As an unincorporated association, the NCAA is governed by its members, which include its schools and athletic conferences. The highest governing body, the Board of Governors, includes chancellors and presidents of member schools, and it also employs the NCAA's president and adopts and implements its policies.

127. The NCAA has adopted a constitution and a number of bylaws. Division I conferences, including all Power Four conferences, also maintain and enforce their own rules. Defendants do not,

---

[35] The original name of the NCAA was the Intercollegiate Athletic Association of the United States (IAAUS), which was formed in 1906. This entity changed its name to the NCAA in 1910.

however, possess lawful authority to impose or threaten sanctions to enforce rules or restraints that violate the law or public policy of the NIL Rights States.

128. The NCAA is a successful money-making organization, reflected in its fiscal year 2024 revenues of $1.38 billion. The NCAA's annual revenues are derived largely from television contracts for the broadcast of men's basketball games, especially from the NCAA's annual "March Madness" tournament, which accounted for approximately $900 million of the NCAA's revenues in fiscal year 2024.

129. The Division I conferences, especially the Power Four, are highly lucrative enterprises, driven in substantial part by the increasing value of their media-rights agreements. The Big Ten's media-rights deals are worth about $1.2 billion annually through the 2029–30 season. The SEC's ESPN football agreement is expected to generate about $710 million annually through 2033–34. The comparable figure for the Big 12 is about $380 million annually through 2030–31, and for the ACC, the annual value of its ESPN media-rights agreement has been reported at roughly $240 million.

130. The NCAA long operated as a coordinating body for its members to agree to restrict the compensation that college athletes earn for providing their athletic services to NCAA schools. A series of judicial decisions have forced the NCAA to relax those pay restrictions, but they remain in place in some form, even after the Court approved the Settlement.

131. The NCAA historically coordinated its members' agreement to bar college athletes from receiving any payments for endorsements, sponsorship, appearances, or use of athletes' NIL rights. This prohibition lasted until the enactment of state laws allowing college athletes to earn compensation from their NIL, which, in conjunction with a 9-0 U.S. Supreme Court ruling in *National Collegiate Athletic Association v. Alston*, 594 U.S. 69 (2021), induced the NCAA to abandon the prohibition on NIL payments, effective July 1, 2021. Before then, the coordinated prohibition on athlete compensation ensured that only the NCAA and its members could profit from the commercialization of athletes' NIL rights, earning substantial revenue by licensing such rights in telecasts, highlight reels, jerseys, and video games, without compensating the athletes.

132. On September 30, 2019, while the *Alston* case was on appeal, California Governor Gavin Newsom signed into law the Fair Pay to Play Act, SB 206. In enacting this legislation, the California legislature stated in Section 1(b) of the bill that its intent was "to continue to develop policies to ensure appropriate protections are in place to avoid exploitation of student athletes, colleges, and universities."

133. California was thereby the first state to enact legislation that not only authorizes NIL compensation for collegiate athletes, but also prohibits the NCAA and athletic conferences from restricting or preventing NIL compensation earned by college athletes attending its schools. California's NIL Law catalyzed a nationwide movement that has resulted in the passage of identical or nearly identical NIL legislation in sixteen other NIL Rights States, as shown in Appendix A.

134. In signing this original version of the California NIL Law, Governor Newsom stated that it marked "the beginning of a national movement—one that transcends geographic and partisan lines. Collegiate student athletes put everything on the line—their physical health, future career prospects and years of their lives to compete. Colleges reap billions from these student athletes' sacrifices and success but, in the same breath, block them from earning a single dollar. That's a bankrupt model—one that puts institutions ahead of the students they are supposed to serve. It needs to be disrupted."[36] The Governor's press release continued: "Further, SB 206 prohibits California colleges from enforcing NCAA rules that prevent student athletes from earning [NIL] compensation, and will prevent the NCAA from banning California universities from intercollegiate sports if their athletes sign sponsorship deals."[37]

135. Similarly, basketball legend LeBron James stated that the legislation was "a game changer for student athletes and for equity in sports. Athletes at every level deserve to be empowered and to be fairly compensated for their work, especially in a system where so many are profiting off of their talents.

---

[36] Press Release, *Ca. Gov. Gavin Newsom, Governor Newsom Signs SB 206, Taking on Long-Standing Power Imbalance in College Sports* (Sept. 30, 2019), available at https://www.gov.ca.gov/2019/09/30/governor-newsom-signs-sb-206-taking-on-long-standing-power-imbalance-in-college-sports/.

[37] *Id.*

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

Part of the reason I went to the NBA was to get my mom out of the situation she was in. I couldn't have done that in college . . . ."[38]

136.    On August 31, 2021, the California state legislature enacted, and Governor Newsom signed into law, SB 26, which moved up the effective date of the Fair Pay to Play Act to September 1, 2021. As amended by SB 26, the Fair Pay to Play Act now reads, in relevant part: "An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, *shall not prevent* a student of a postsecondary educational institution participating in intercollegiate athletics from earning compensation as a result of the use of the student's name, image, likeness, or athletic reputation." Cal. Educ. Code § 67456(a)(2) (emphasis added).

137.    In addition, SB 26 retained this language of SB 206, which is now part of the Fair Pay to Play Act: "An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, *shall not prevent* a postsecondary educational institution from participating in intercollegiate athletics as a result of the compensation of a student athlete for the use of the student's name, image, likeness, or athletic reputation." *Id.* § 67456(a)(3) (emphasis added).

138.    As Governor Newsom made clear, the California NIL law does not prohibit NIL being conditioned on attending a specific school or prohibit NIL from being used as "pay-for-play," as that term has sometimes been used. Instead, the California NIL Law is titled the "Fair Pay to Play Act," which makes clear that pay-for-play, as permitted and protected in the Act, is lawful, legitimate NIL compensation.

139.    California's NIL Law was thus a major advance in validating the economic rights of college athletes in the state. The California schools that are members of a Power Four conference celebrated this development in various ways, embracing the opportunities it created for their college athletes.

[38] *Id.*

140. Martin Jarmond, UCLA's Athletic Director, stated on August 23, 2021: "We enthusiastically embrace Name, Image and Likeness. With the launch of Westwood Ascent, we're well-positioned to be a leader in providing our student-athletes the tools to maximize their NIL opportunities in Los Angeles and beyond."[39]

141. In 2021, Stanford's (now former) Athletic Director, Bernard Muir, stated: "This new NIL legislation provides exciting new opportunities for student-athletes, and we believe that Stanford is uniquely positioned to deliver NIL value to our students."[40]

142. In 2023, UC Berkeley's (now former) Athletic Director Jim Knowlton similarly encouraged lawful NIL activity, stating: "The University of California, Berkeley has always been an amazing place for young men and women to build their brand and launch their careers. With the new NIL legislation in place, GOLDEN will help provide additional tools for Cal student-athletes to capitalize on their value in the marketplace in a distinct Cal way that builds on their achievements on the playing fields, in the classroom and in the community."[41]

143. USC's Athletic Director, Jennifer Cohen, also celebrated USC's NIL collective (called House of Victory ("HOV")), stating: "For the 2023–2024 academic year, HOV exceeded all its fundraising goals, and our donors stepped up to help us more than double our total funds from the previous year, putting USC in the upper tier of NIL collective support nationally. We are extremely proud of its growth and for the generosity and support from Trojans everywhere."[42]

144. The laws in the NIL Rights States create integral roles for so-called NIL collectives. An NIL collective is an organization that is typically formed by fans, alumni, donors, and supporters of a

---

[39] *UCLA Athletics Introduces "Westwood Ascent" NIL Program*, Bruin Athletics (Aug. 23, 2021), https://uclabruins.com/news/2021/8/23/bruin-athletics-ucla-athletics-introduces-westwood-ascent-nil-program.

[40] *Stanford Launches Cardinal Connect*, Stanford Athletics (June 30, 2021), https://gostanford.com/news/2021/06/30/stanford-launches-cardinal-connect.

[41] *Cal Launches GOLDEN Program for Student-Athletes*, Cal Athletics (July 1, 2021), https://calbears.com/news/2021/7/1/athletics-news-cal-launches-golden-program-for-student-athletes.aspx.

[42] *The State of Troy | Aug. 2: USC's Move to Big Ten, Paris Olympics, NIL Update, and More*, USC Athletics (Aug. 2, 2024), https://usctrojans.com/news/2024/8/1/The-State-of-Troy-August-2-USC-Move-To-Big-Ten-Paris-Olympics-NIL-Update.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

school's athletic program, and that pools contributions from those supporters and uses them to create and fund NIL compensation opportunities for the school's athletes. Collectives work with athletes to structure NIL arrangements, which include appearances, endorsements, promotional activities, social-media campaigns, charitable partnerships, and community engagements. Through these arrangements, collegiate athletes are compensated for the commercial value of their names, images, likenesses, and athletic reputations.

145. With the enactment of state NIL laws, as the statements of the athletic directors at UCLA, Stanford, UC Berkeley, and USC reflect, collectives became a celebrated and critical part of college athletics. In California, for example, these collectives provide California college athletes with a practical mechanism to realize the economic rights that California's Fair Pay to Play Act guaranteed them. For athletes in all of the NIL Rights States, particularly those competing in FBS football and men's basketball at prominent Power Four programs, NIL arrangements with collectives often represented the primary and most significant source of NIL compensation available to them. The compensation those arrangements produced reflected the substantial commercial value that those athletes' participation in high-profile athletic programs generates for schools, their supporters, and their media and commercial partners.

146. In short, college athletes' NIL rights, especially for Division I athletes playing FBS football and men's basketball, have become highly valuable. Before 2021, only the NCAA and its member institutions profited from the commercialization of these athletes' NIL rights. Since then, college athletes have also been able to receive NIL compensation. Plaintiffs and members of all Classes would have received more NIL compensation absent the Agreement.

### C. The *House* Litigation and Settlement

147. In 2020, NCAA athletes filed multiple class actions in this Court against the NCAA and the then-Power Five conferences, alleging that the NCAA's prohibitions on college athletes from earning NIL compensation violated Section 1 of the Sherman Act. The Court consolidated the cases under *In re College Athlete NIL Litigation*, Case No. 20-cv-03919 (N.D. Cal.).

148. On July 26, 2024, Plaintiffs in that litigation moved for preliminary approval of a class action settlement, widely called the *House* Settlement. After both preliminary and final approval hearings, and certain adjustments made by the parties, the Court approved the Settlement on June 6, 2025.

149. The Settlement has two parts: (a) damages for members of three classes, totaling $2.8 billion, to be paid over ten years; and (b) the IRS, also extending over ten years, authorizing the NCAA and conferences to modify preexisting NCAA rules and to enact new rules governing athlete compensation for Division I schools that opt in to the revised NCAA rules. The Settlement is on appeal, but the provisions of the IRS have nonetheless been implemented. This action concerns two aspects of the revised NCAA rules under the Settlement.

150. First, for Division I schools that opt in, the IRS permits the NCAA and the Power Four conferences to enforce an annual total cap on direct benefits and compensation ("Direct Payments"). Specifically, Division I schools can pay their athletes an amount that is equal to 22% of the average annual athletic revenue of all Power Four conferences and Notre Dame subject to specified yearly increases. IRS Art. 3.

151. Second, for Division I schools that opt in, the IRS authorizes the NCAA to enforce new rules that prohibit NIL payments by "Associated Entities or Individuals" if they are not for a "valid business purpose" related to the promotion or endorsement of goods or services "provided to the general public for profit," "with compensation at rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes" at NCAA Division I schools (the "Range of Compensation" restrictions). IRS Art. 4, § 3.[43]

152. The IRS does not require nationwide uniformity in the implementation of the revised NCAA rules, and it does not preempt state NIL laws.

153. The CSC's requirements of "valid business purpose" and "provided to the general public for profit," as Defendants have implemented them, do not simply police unlawful or fraudulent transactions. Instead, they suppress or eliminate whole categories of NIL opportunities that the laws in the NIL Rights States protect.

---

[43] "Associated Entities or Individuals" are defined in the IRS. *Supra* note 5.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

154. By contrast, the NIL Restrictions do not prohibit NIL compensation paid by *unaffiliated third parties* (third parties other than "Associated Entities and Individuals"), leaving free-market forces to determine NIL values from those sources without any cap. Because NIL values are substantially dependent on the school an athlete chooses to attend, which has its own conference affiliation, media market, and national visibility, unaffiliated third parties may and do offer athletes NIL compensation that varies based on where they play.

### D. The Post-Approval Implementation of the Settlement

155. On June 6, 2025, the day the Court approved the Settlement, the Power Four conferences launched the CSC as the Designated Enforcement Entity. The Power Four conferences created, own, and oversee the CSC. The CSC, *inter alia*, implements the NIL Restrictions by ensuring its members' compliance with the 22% revenue-sharing cap on Direct Payments and ensuring athletes' compliance with the "valid business purpose" and Range of Compensation restrictions on payments made by Associated Third Parties. On October 30, 2025, the CSC issued a statement that it was enforcing the revised NCAA rules that became effective on June 6, 2025.

156. As part of the post-Settlement enforcement system, the CSC launched "NIL Go" on June 11, 2025. NIL Go is an online reporting and review system the CSC operates, requiring Division I student-athletes to submit third-party NIL agreements for approval and screening those agreements based on alleged compliance, business-purpose, and compensation standards.

157. The CSC uses NIL Go to help enforce the NIL Restrictions, and thereby is a part of Defendants' mechanism of restraining NIL payments to members of all proposed Classes. The NIL Go reporting and review system delays, deters, and suppresses NIL compensation in California and the other NIL Rights States by subjecting deals to after-the-fact scrutiny, valuation challenges, and threatened penalties. The CSC's activities chill lawful NIL activity that the NIL laws in the NIL Rights States protect.

158. In October 2025, the CSC further expanded its enforcement apparatus by launching an anonymous "tip line" that invites anyone to confidentially report alleged violations of the rules governing Associated Third-Party NIL deals and revenue sharing.

159. Through their respective constitutions and bylaws, each Power Four conference asserts and exercises the power to enforce its rules against member schools and their personnel by imposing substantial sanctions, including but not limited to monetary fines, suspensions from competition in particular sports, loss of hosting or championship privileges, and, in extreme cases, expulsion from conference membership.

160. Acting in concert with the NCAA, the Power Four conferences have used this enforcement authority to adopt, maintain, and threaten to enforce NIL-related restrictions that purport to bind all member schools, including those located in the NIL Rights States, notwithstanding each respective state's NIL statute prohibiting these and other sports governing bodies from interfering with college athletes' rights to earn NIL compensation.

161. In particular, Defendants have agreed upon and implemented conference-wide NIL rules, policies, guidelines, and "best practices" that: (a) condition membership and participation in Power Four conferences on adherence to NCAA and conference NIL limits; and (b) authorize the conferences to sanction NIL Rights States' member schools—through fines, suspensions, or other punitive measures— if those schools decline to enforce NCAA or conference NIL restrictions that conflict with the schools' respective state NIL law.

162. By leveraging their collective rulemaking and disciplinary power in this manner, the Power Four conferences and the NCAA have combined and conspired to: (a) override each NIL Rights State's statutory protections for college athletes' NIL rights; (b) coerce schools in the NIL Rights States into enforcing illegal restraints; and (c) deter schools in the NIL Rights States from honoring state law under threat of competitive and financial penalties, thereby tortiously interfering with the prospective economic advantage of Plaintiffs and members of the California Classes from Direct Pay NIL and Associated Third-Party NIL contracts.

163. During the Class Period, the Individual Defendants, acting through and with the NCAA and the Power Four conferences, participated in, enforced, and agreed to the Agreement undertaken by the Institutional Defendants. The Individual Defendants have used their authority to ensure that the NIL Restrictions were implemented and enforced against NIL Rights States' schools and athletes, despite

45

state law to the contrary, with the purpose and effect of coercing those schools to comply with unlawful restraints and suppressing and preventing the NIL compensation of Plaintiffs and members of the proposed Classes.

164.    Defendants have voluntarily chosen to implement the NIL Restrictions of the Settlement uniformly across all states, including the NIL Rights States, notwithstanding their state laws barring such restrictions, through enforcement of the revised NCAA bylaws, the CSC enforcement regime, and NIL Go reporting requirements.

165.    The NCAA, with other Defendants, designed the CSC and has been involved in the implementation of the revised NCAA rules. On October 28, 2025, the NCAA Division I Board of Directors adopted an emergency bylaw amendment authorizing the CSC, under NCAA bylaws, to penalize Division I athletes who fail to report qualifying non-institutional NIL deals to NIL Go, including by declaring them ineligible for practice and competition until the deal is reported.[44] In addition, the Power Four conferences, including their commissioners, have been "heavily involved" in designing specific penalties for violations of the NIL Restrictions.[45]

166.    In approving the Settlement, the Court did not rule that the Settlement preempted contrary state laws. Instead, the Court clarified that the Settlement "does not require that this Court find that the SA preempts state laws regarding student-athlete compensation, nor is the Court making such a finding." *College Athlete NIL Litig.*, 803 F. Supp. 3d at 1010. Because no such federal law exists, the NCAA and the Conference Defendants obtained a commitment from the *House* plaintiffs' counsel to make

---

[44] Christopher Brolley & Callan Stein, *NCAA Amends Bylaws as CSC Hires Former Federal Prosecutor*, JD Supra (Oct. 31, 2025), https://www.jdsupra.com/legalnews/ncaa-amends-bylaws-as-csc-hires-former-5618904/.

[45] Bryan Fischer, *College Sports' Revenue-Sharing Era Faces Early Concerns Over Collectives*, Sports Illustrated (July 23, 2025), https://www.si.com/college-football/college-sports-revenue-sharing-era-concerns-collectives. The CSC's website has not spelled out the specific penalties, but leaves broad room for discretion: The organization will "investigate[] any potential violations of these rules, make[] determinations regarding potential rules violations and penalties, provide[] notice and opportunity to be heard, participate[] in the arbitration process and ultimately administer[] penalties for violations of these rules." *Enforcement*, Coll. Sports Comm'n, https://www.collegesportscommission.org/enforcement (last visited June 7, 2026).

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

"reasonable efforts" to support federal or state legislation to accomplish that objective. IRS Art. 7, § 1. Congress has not adopted such preemption legislation.

## VI.     COUNTS

**COUNT I**
**SECTION 1 OF THE SHERMAN ACT**
**15 U.S.C. § 1**
**ON BEHALF OF THE FEDERAL CLASSES**

167.     Plaintiffs incorporate the allegations above.

**A.     The Agreement Violates Section 1 of the Sherman Act**

168.     Plaintiffs allege a horizontal agreement in violation of Section 1 of the Sherman Act. Plaintiffs plead alternative legal characterizations of the Agreement, including price fixing and group boycott, to reflect the two ways in which Defendants conduct restrains trade.

169.     Defendants have agreed to restrain trade through their Agreement to suppress competition for Revenue-Generating College Athletes in the NIL Rights States. Members of the Federal Direct Pay NIL Class and the Federal Associated Third-Party NIL Class are victims, and have been harmed by, the Agreement. Each Individual Defendant knowingly authorized, directed, ratified, or substantially participated in the Agreement.

170.     Defendants impose and enforce uniform NIL Restrictions that prevent NCAA Division I schools and Associated Third Parties in the NIL Rights States from competing independently for NIL rights. The Agreement has artificially suppressed NIL compensation by precluding market competition in those states, in which Division I schools and Associated Third Parties would otherwise aggressively compete to make NIL payments for Revenue-Generating College Athletes in the NIL Rights States.

171.     The Agreement constitutes a horizontal restraint that fixes, caps, or suppresses the price and output of NIL compensation by eliminating independent competition among Division I member schools for NIL rights for Revenue-Generating College Athletes. By requiring uniform adherence to NIL Restrictions in the NIL Rights States, Defendants have replaced market-based negotiation with collective suppression, resulting in compensation below competitive levels to members of both Federal Classes.

47

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

172.     Such horizontal price fixing and output suppression is illegal. Unlike compensation for athletic services that is tethered to the reimbursement of education-related expenses, NIL licenses constitute the commercial exploitation of an athlete's distinct publicity rights. Defendants are collectively agreeing to fix and suppress the prices or revenue athletes receive from a distinct category of rights. That is classic horizontal output restriction and price fixing.

173.     The Agreement is also a concerted refusal to deal: a group boycott with both horizontal and vertical components that together suppress competition for athlete NIL rights.

174.     The horizontal component is the agreement among the Power Four conferences themselves. The conferences are horizontal competitors—they compete for athletes, television revenues, and institutional prestige. Yet they collectively created the CSC, collectively authored the IRS, and collectively agreed to implement uniform NIL Restrictions through their jointly controlled enforcement mechanism. This horizontal agreement among competing buyers establishes the terms of the boycott: it fixes the price of NIL compensation at the cap level, substantially curtails or eliminates an entire category of Associated Third-Party NIL, and excludes from the market any school or athlete that seeks to transact outside those terms. The collective exclusion is a group boycott regardless of whether the excluded parties—schools, athletes, and Associated Third Parties—are themselves competitors of the boycotting conferences.

175.     The vertical component is the coercion of member schools and athletes as the enforcement mechanism of that horizontal agreement. Defendants have collectively conditioned conference affiliation, athlete eligibility, and competitive participation on compliance with the NIL Restrictions, and threatened exclusion of any school or athlete that seeks to engage in lawful NIL transactions outside Defendants' agreed-upon limits. This vertical pressure, using control over access to an essential competitive platform to compel compliance with horizontally fixed terms, converts the horizontal agreement into a comprehensive market-wide restraint. Schools cannot deviate from the cap without risking conference membership. Athletes cannot transact freely without risking eligibility. Associated Third Parties cannot offer competitive NIL arrangements without triggering CSC enforcement. The vertical coercion thus

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

ensures that the horizontal agreement operates not merely as a rule on paper but as a binding constraint on every participant in the NIL market.

176. The two aspects of the boycott reinforce each other. The horizontal agreement among competing conferences establishes the terms of the boycott; the vertical coercion of schools enforces it. Together, they produce a comprehensive restraint on competition for athlete NIL rights in which competing parties agreed on market terms and collectively ensured compliance through threatened exclusion of any party, school, or athlete that sought to transact outside those terms. Defendants' collective denial of access to an essential competitive platform constitutes a classic group boycott, warranting condemnation under Section 1.

177. Defendants have enforced and threatened to enforce the Agreement through the NCAA's Article 19 enforcement regime and the newly established CSC. Collectively, these organizations have the authority to investigate, adjudicate, and penalize alleged noncompliance with NCAA NIL rules. Article 19 also authorizes a broad range of sanctions, including ineligibility determinations, postseason bans, scholarship limitations, fines, and other competitive penalties that no rational school or athlete could risk incurring.

178. The Power Four conferences and their commissioners are integral participants in this enforcement regime. As members of the NCAA, Conference Defendants participated in adopting and maintaining the NIL restrictions at issue and collectively govern, staff, and oversee the CSC, which has been vested with exclusive enforcement authority over NIL compliance. Through this structure, Defendants jointly created and control the mechanisms by which compliance is compelled and deviations are deterred. The credible threat of these penalties, rather than the mere existence of the rules themselves, coerces uniform adherence and forecloses independent competition for NIL rights where such competition is allowed.

179. The Agreement unreasonably restrains trade by suppressing NIL compensation, reducing output, and foreclosing independent competition in a market that state law permits to function competitively. It does so without any procompetitive justification, and if there were any such justification, Defendants could achieve it through substantially less restrictive alternatives.

180. The Agreement has thus created and imposed direct anticompetitive effects through the suppression of NIL compensation received by Plaintiffs and members of both Federal Classes. They have suffered antitrust injury because the suppression of NIL compensation is a type of injury the antitrust laws were designed to prevent and flows from the Agreement.

181. As a result of the Agreement, nearly all Division I schools in the NIL Rights States have adhered to both the Direct Pay Cap and the Associated Third-Party NIL Compensation Restrictions, even though the NIL laws in those states permit schools and Associated Third Parties to pay athletes more for their NIL. Defendants have thereby suppressed and prevented NIL compensation of Plaintiffs and the other members of the Federal Classes.

182. The existence of audits, reporting requirements, and penalties administered by the CSC as part of the Agreement renders the cap a binding ceiling for rational market participants. Schools must set compensation with the expectation that exceeding the cap exposes them to investigation and penalties.

183. As a result, Defendants' coordinated restraint chills competition on a market-wide basis in the markets described below. This chilled competition has suppressed NIL compensation market-wide below competitive levels.

184. The conspiracy among the NCAA, the Power Four conferences, and the College Sports Commission to suppress NIL compensation operates on a conference-wide and national basis, without geographic limitation. Each conference's NIL restrictions apply uniformly to all member institutions regardless of state. Plaintiffs' claims arise from the application and enforcement of that national conspiracy within the NIL Rights States, where the conspiracy has caused injuries that are independently actionable under federal and state law and give rise to federal antitrust standing. The geographic scope of Plaintiffs' claims, as set forth below, does not define or limit the scope of the conspiracy itself.

185. The Agreement has been willful and intentional. In particular, before or since the Court approved the Settlement and when the revised NCAA rules went into effect, Defendants knew that the implementation of the new NIL Restrictions and the revised NCAA rules, through the CSC's enforcement, would conflict with the NIL laws in the NIL Rights States. Defendants nonetheless agreed to implement the NIL Restrictions in the NIL Rights States.

### 1. The Relevant Markets

186. There are two distinct product markets and one geographic market applicable to both product markets.

187. The product market for the Direct Pay NIL Compensation Class includes compensation paid directly by schools to Revenue-Generating College Athletes in exchange for licenses to use their NIL, including revenue-sharing payments authorized by the Settlement.

188. A hypothetical monopsonist consisting of schools providing Direct Pay NIL Compensation to Revenue-Generating College Athletes could profitably impose a small but significant and non-transitory decrease in compensation (or equivalent worsening of terms) without losing sufficient athletes or transactions to alternative forms of compensation to render the decrease unprofitable. Direct Pay NIL Compensation is not reasonably interchangeable with Third-Party NIL Compensation or non-NIL educational benefits because it involves a distinct counterparty (the schools), a distinct contractual structure, and a distinct legal regime.

189. Revenue-Generating College Athletes have no meaningful alternative to Direct Pay NIL Compensation if schools collectively agree to suppress it. Scholarships, cost-of-attendance stipends, and education-related benefits are not substitutes: they are fixed, non-negotiated educational benefits that schools provide under uniform rules, not market compensation for the commercial use of an athlete's NIL. An athlete whose Direct Pay NIL Compensation is suppressed below competitive levels cannot simply redirect that lost income to a scholarship. The scholarship exists independently of, and is unaffected by, any NIL negotiation. Because athletes have no competitive alternative to turn to when Direct Pay NIL is suppressed, schools acting in concert can profitably reduce that compensation without losing athletes to substitute sources of income. This absence of any realistic substitute confirms that Direct Pay NIL Compensation constitutes a distinct product market.

190. The relevant product market for Third-Party NIL Compensation includes compensation paid to Revenue-Generating College Athletes by third parties in exchange for licenses to use those athletes' NIL rights. The Third-Party NIL Market includes NIL compensation from both Associated Third Parties ("associated buyers") and other third parties, including unaffiliated commercial third parties

("unaffiliated buyers"). Both types of buyers belong in the same product market not because associated and unaffiliated buyers compete for mutually exclusive rights—they do not, because athletes can and do license their NIL simultaneously to multiple buyers for different purposes—but because both types of buyers purchase from the same athletes the same underlying product: commercial licenses to use Revenue-Generating College Athletes' NIL.

191. The two buyer types reinforce each other in a competitive market. Boosters and collectives bid for athlete NIL out of loyalty to their school and its program; commercial sponsors bid for athlete NIL because of the athlete's market visibility and commercial value. Both streams of demand flow simultaneously to the same athletes. They belong in the same product market because suppressing one suppresses the other: when the NIL Restrictions effectively push associated buyers out of the market, commercial sponsors respond by reducing what they offer as well. Without the competitive pressure that associated buyers generate, the market for athlete NIL becomes less competitive across the board, and every athlete's compensation suffers. That interconnection, stemming from the way suppressing one category of buyer depresses the entire market, is the economic reason both buyer types belong in the same product market.

192. A hypothetical monopsonist controlling Third-Party NIL Compensation could profitably impose a small but significant reduction in compensation without losing sufficient transactions to other forms of remuneration to render the reduction unprofitable. Third-Party NIL Compensation is not reasonably interchangeable with Direct Pay NIL Compensation because it involves different counterparties, different contracting dynamics, and different sources of demand.

193. Revenue-Generating College Athletes cannot substitute Direct Pay NIL Compensation (from schools) for Third-Party NIL Compensation in response to a decrease in third-party compensation where Direct Pay NIL is unavailable, capped, or itself restrained. Nor can these athletes substitute non-NIL benefits or scholarships, which are not negotiated in a competitive market and do not reflect sponsor or booster demand. Because athletes have no realistic substitute to turn to when third-party NIL compensation is suppressed, and because third-party buyers have no comparable alternative market in

which to deploy their demand, a collective reduction in Third-Party NIL Compensation can be imposed profitably. Third-Party NIL Compensation therefore constitutes a distinct relevant product market.

194. The NIL rights that make up the relevant product markets are not reasonably interchangeable with the NIL rights of athletes competing in lower-tier NCAA athletic programs. Buyers of NIL rights for Revenue-Generating College Athletes at major Division I programs would not substitute lower-tier athlete NIL in response to a price increase because those products serve fundamentally different commercial purposes and generate vastly different commercial value to buyers. The price difference between Revenue-Generating College Athletes' NIL and lower-tier athlete's NIL is substantial and persistent, and it reflects genuine product differentiation rather than mere quality variation within a single market. Revenue-Generating College Athletes at major Division I programs, especially FBS football and men's basketball, compete before in-person audiences of tens of thousands and television audiences of millions. Their institutional affiliations carry national brand recognition. Their NIL rights generate commercial demand from national sponsors, media companies, and institutional alumni bases of extraordinary size and wealth. Lower-tier athlete NIL generates a fraction of that commercial demand, not merely a discounted version of the same product, but a categorically different commercial asset serving categorically different buyer needs.

195. Both product markets are distinct from the market for athletic services provided by Revenue-Generating College Athletes.

196. The relevant geographic market for both the Direct Pay NIL Market and the Third-Party NIL Market is the set of states, the NIL Rights States, whose NIL laws prohibit the NCAA and athletic conferences from preventing athletes from earning NIL compensation, making those laws specifically inconsistent with the *NIL Restrictions* challenged in this Complaint. This geographic market is defined by the economic standard applicable to all antitrust geographic markets: it is the area within which a hypothetical monopsonist controlling the relevant product could profitably impose a non-transitory reduction in the price paid to athlete-sellers without losing those sellers to suppliers or buyers outside the area.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

197. A hypothetical monopsonist controlling athlete NIL rights in NIL Rights States could profitably impose such a price reduction.

198. Absent the NIL Restrictions, non-NIL Rights States do not offer a competitive NIL market as an alternative to NIL Rights States. They offer the same *House*-restricted market, subject to the same Direct Pay Cap, the same Associated Third-Party NIL Compensation Restrictions, and the same NIL Go enforcement regime. An athlete who transfers from a school in an NIL Rights State to a school in a non-NIL Rights State does not access a competitive NIL price. That athlete accesses the same uncompetitive price in a different location. When the alternative market offers the same uncompetitive price rather than a competitive price, it is not a competitive alternative for the purposes of defining a geographic market.

199. The legal framework of NIL Rights States reinforces and explains this economic result. The reason that states other than NIL Rights States do not offer competitive NIL markets is that those states' laws do not prohibit the NIL Restrictions. The competitive environment that characterizes the NIL Rights States, in which athlete NIL compensation is legally protected from NCAA and conference interference, does not extend to other states because those states have not enacted equivalent legal protections. The legal boundary between NIL Rights States and other states therefore corresponds to a genuine economic boundary in competitive conditions.

### 2. Conference Defendants' Substantial Market Power

200. The Power Four conferences collectively possess substantial market power in the market for Direct Pay NIL Compensation. These conferences together control the most competitively significant platform for elite Division I football and men's basketball, including conference membership, athlete eligibility, access to nationally televised competition, postseason participation, and the visibility necessary for NIL monetization.

201. For Revenue-Generating College Athletes, participation outside the Power Four conferences does not offer a commercially comparable substitute in terms of exposure, competitive quality, or professional advancement. As a result, neither athletes nor schools can reasonably substitute away from Power Four competition in response to suppressed Direct Pay NIL Compensation. This lack of practical alternatives enables the Power Four conferences, acting in concert, to impose and maintain

uniform restrictions on Direct Pay NIL Compensation in states where such compensation is lawful, and to do so profitably through coordinated enforcement.

202. The Power Four conferences also possess substantial market power in the market for Third-Party NIL Compensation. Third-Party NIL demand is driven by association with athletes competing in Power Four football and men's basketball, which provide the audience size, media exposure, and competitive relevance that make NIL transactions economically valuable.

203. Because access to that exposure is conditioned on eligibility and participation in Power Four competition, Third-Party NIL counterparties cannot practicably substitute sponsorships or endorsements involving athletes outside the Power Four conferences. By jointly controlling the terms of athlete eligibility and participation, the Power Four conferences can and do impose uniform restrictions that suppress Third-Party NIL Compensation below competitive levels without losing sufficient transactions to alternative platforms.

204. The Power Four conferences' market power is confirmed by their ability to enforce uniform NIL Restrictions through coordinated eligibility rules, conference sanctions, and their collective governance and control of NIL enforcement mechanisms, including through the CSC and the NCAA's Article 19 enforcement powers. The credible threat of exclusion from Power Four competition, loss of eligibility, or other competitive penalties ensures uniform compliance and prevents individual schools from deviating, demonstrating the Power Four conferences' ability to control market outcomes and sustain anticompetitive restraints over time.

### 3. Direct Anticompetitive Effects

205. Because the Power Four conferences collectively control the only economically viable platform for elite Division I football and men's basketball, their agreement to impose uniform NIL Restrictions predictably suppresses prices and output in the markets for Direct Pay NIL and Third-Party NIL Compensation.

206. The absence of meaningful substitutes for athletes, schools, or NIL counterparties also renders the anticompetitive effects of the Agreement obvious, amenable to condemnation under a quick look standard of review.

207. NIL compensation in the relevant markets is commonly structured to reflect the collective exploitation of team and roster NIL rights in connection with broadcasts, merchandising, promotions, and digital content. Such group licensing arrangements typically include minimum or baseline compensation for all rostered athletes whose NIL is exploited, with additional amounts determined by role, exposure, or other neutral factors. Suppressing competition for these licenses therefore necessarily reduced compensation for all or virtually all Revenue-Generating College Athletes in all Classes.

**B.      There Are No Procompetitive Justifications**

208. There are no procompetitive justifications for the Agreement. The Agreement is not necessary to preserve college sports by preventing "pay-for-play" and thus "fake" or "sham" NIL deals; to preserve competitive balance; or to prevent schools from making improper "inducements." If any such justifications carry any weight at all, they do not outweigh the anticompetitive effects of the Agreement either individually or collectively.

209. First, in *Alston*, the Supreme Court unanimously rejected the notion that the NCAA can obtain antitrust immunity simply by relabeling its restraints as features of an "amateur" product, particularly where it has not maintained a consistent definition of amateurism. The same principle applies here: the NCAA and athletic conferences cannot avoid antitrust and state-law scrutiny simply by relabeling disfavored NIL arrangements as "pay-for-play" or "fake," while relabeling favored arrangements as "true" NIL.

210. The University of Tennessee, for example, announced a ten-year Adidas agreement that "guarantees 'unprecedented' NIL opportunities" for its athletes, which its athletic director publicly described as a "significant advantage," while Pennsylvania State University has unveiled a parallel ten-year Adidas deal reportedly worth hundreds of millions of dollars.[46] Such schools' ability to arrange large-dollar NIL deals with major companies reveals that Defendants' "Associated Entity or Individuals" label is not a narrow tool to police fraud, but a smokescreen that suppresses NIL compensation from certain supporters while encouraging uncapped NIL compensation from others in the NIL Rights States.

---

[46] *See* Amanda Christovich, *How Schools Are Skirting the New Salary Cap in College Sports*, Front Off. Sports (Sept. 20, 2025), https://frontofficesports.com/schools-skirting-salary-cap-college-sports/.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

211. Statements by officials at various Big Ten schools also confirm that school decision-makers have understood NIL provided by Associated Third Parties to be a lawful and desirable means of supporting their athletes and programs, not a fraudulent or illegitimate practice that must be singled out for categorical suppression.

212. At the University of Illinois, for example, Athletic Director Josh Whitman publicly expressed gratitude for the Illini Guardians collective and expressed excitement to support its ICON NIL collective in a media release that also asked fans to support ICON's athlete NIL deals by donating to ICON.[47] At Ohio State University, then-Athletic Director Gene Smith issued a public statement identifying three NIL "collective" organizations "in operation now and seeking additional support" to help Buckeye athletes maximize NIL opportunities.[48] In discussing Ohio State's NIL efforts and the role of its Associated Third Parties, Ryan Day explained, "We have some folks that are really helping and doing everything they can and that's great. We're gonna need as much help as we can moving forward," and emphasized that Ohio State has "great fans who want to support it."[49] UCLA Athletic Director Martin Jarmond likewise "encourage[d] all alumni, fans and friends of UCLA Athletics to support the collectives and marketplaces related to NIL opportunities for UCLA student-athletes" and expressed that "[w]e are committed to supporting other collectives formed to support our teams and student-athletes in the future."[50] UCLA men's basketball coach Mick Cronin urged fans to "support Men of Westwood" and wore Men of Westwood merchandise during practices.[51]

---

[47] *ICON to Become Preferred NIL Collective; Illini Guardians to Wind Down Operations*, Univ. of Ill. (Aug. 24, 2023), https://fightingillini.com/news/2023/8/24/general-icon-to-become-preferred-nil-collective-illini-guardians-to-wind-down-operations.aspx.

[48] *Updates on Ohio State NIL Collective Organizations*, Ohio State Univ. Athletics (Dec. 8, 2022), https://ohiostatebuckeyes.com/news/2022/12/8/nil-collectives.

[49] Dan Hope, *Ryan Day Says NIL is Becoming "The Conversation" for Many Recruits*, Eleven Warriors (Dec. 16, 2022), https://www.elevenwarriors.com/ohio-state-football-recruiting/2022/12/136113/ryan-day-says-nil-is-becoming-the-conversation-for-many-recruits.

[50] Martin Jarmond, *Supporting UCLA Student-Athletes' Ability to Profit From NIL Opportunities*, UCLA Athletics (Dec. 20, 2022), https://uclabruins.com/news/2022/12/20/bruin-athletics-letter-from-athletic-director-martin-jarmond.

[51] Lauryn Olina Wang, *The LOW Down: Men of Westwood NIL Collective Falls Short of Serving Student-Athletes*, Daily Bruin (Nov. 5, 2023), https://dailybruin.com/2023/11/05/the-low-down-men-of-westwood-nil-collective-falls-short-of-serving-student-athletes.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

213. In short, Defendants' later attempts to rebrand the same collective activities as "fake NIL," "pay-for-play," or abusive conduct cannot justify the broad restraints challenged in this case. Those attempts instead underscore that those restraints are policy choices that suppress one favored source of athlete compensation while leaving other NIL payors uncapped.

214. Additional reasons demonstrate that any distinction between "true" and "pay-for-play" NIL payments is an untenable one. Schools compete with one another in recruiting high school students and transfers through the amounts of direct payments the schools are willing to offer, and those direct payments consist in whole or in part of licenses for the athletes' NIL. In other words, the direct payments themselves are "pay-for-play," to use the NCAA's terminology, and they are specifically authorized under the Settlement and the revised NCAA rules.

215. In addition, the fact that the CSC is implementing the NCAA's "valid business purpose" and Range of Compensation restrictions only on NIL payments made by Associated Third Parties and not on other third parties, such as publicly traded for-profit corporations worth billions of dollars, undercuts any claim that those restrictions are needed to prevent "pay-for-play" NIL. That is because under the revised NCAA rules, third parties that are not Associated Third Parties can make their NIL payments to athletes conditional on attending a specific school, which, according to the NCAA, constitutes "pay-for-play."

216. Moreover, the NIL value paid by any party depends in significant part on which school college athletes decided to attend, either as freshmen or in later years by entering the NCAA's "Transfer Portal."[52] That is, the *market* value of an athlete's NIL rights and his decision where to enroll, if given a choice, are intertwined. Other things being equal, an FBS football or men's basketball player who attends and plays for a Power Four school will have higher NIL value than if that athlete attended and played for a school outside the Power Four conferences. That is because Power Four teams are more likely to have

---

[52] The NCAA Transfer Portal is an online database that allows college athletes to publicly declare their intention to transfer schools. It was established in 2018 and serves as a central, real-time list of athletes available for recruitment. Once an athlete's name is entered, it signals to all other NCAA programs that he is open to being recruited, and the athlete can then explore new opportunities with other schools. Greg Johnson, *What the NCAA Transfer Portal Is…and What It Isn't*, NCAA (Oct. 8, 2019), https://www.ncaa.org/news/2023/2/8/media-center-what-the-ncaa-transfer-portal-is-and-what-it-isn-t.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

their games televised nationally and overwhelmingly represent teams that play in lucrative postseason games, which enhance an athlete's name recognition and commercial value.

217. In assessing the validity of athletes' NIL deals with Associated Third Parties, the CSC appears to account for "the local market and the market reach of his or her institution and program."[53] This is not equivalent to allowing the *marketplace* to freely set an athlete's NIL value. The CSC's evaluation of each NIL deal offered by an Associated Third Party replaces competitive bidding with an agreed-upon benchmark backed by penalties the CSC can impose. When NIL deals must be pre-cleared, or are policed ex post with penalties, Associated Third Parties are chilled in what they will offer an athlete.

218. The CSC's enforcement regime, overseen by the Power Four conferences, is a classic cartel compliance mechanism: the CSC's benchmark becomes a soft cap that restrains what Associated Third Parties would otherwise pay for athletes' NIL rights. Indeed, shortly after the Settlement was approved, it was reported that Deloitte, the firm chosen to operate the NIL clearinghouse, estimated that "roughly 90% of deals involving public companies for an athlete's NIL would have been approved by the new system, but nearly 70% of those with collectives would have been initially denied."[54]

219. On June 30, 2025, the collective for UC Berkeley, California Legends, ceased operations. This happened in part because it lacked the resources to defend the market value of every NIL deal for all of its 900 athletes. Upon information and belief, the revised NCAA rules and NIL Restrictions have led many other Associated Third Parties from Power Four schools either to shut down or to be absorbed into the schools they once supported. When a former collective is absorbed into the school in this way, the NIL payments that entity previously made as an independent third party must now be aggregated with other

---

[53] Under the CSC's Range of Compensation restrictions, according to the CSC: "The RoC is a deal level calculation that is intended to capture a student-athlete's unique NIL value based upon multiple factors, including but not limited to, the deal's performance obligations, the student-athlete's athletic performance and social media reach, the local market and the market reach of his or her institution and program. The RoC is also informed by external benchmarks and updates and evolves on a routine basis to ensure it is accurately reflecting the current market." *Student-Athlete NIL Deals*, Coll. Sports Comm'n, https://www.collegesportscommission.org/nil (last visited May 14, 2026).

[54] Bryan Fischer, *How Will New College Sports Commission Enforce Post-Settlement Regulations?*, SI.com (June 17, 2025), https://www.si.com/college-football/college-sports-commission-enforcement-house-settlement-ncaa.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

direct institutional payments and subjected to the 22% revenue cap, converting what had been uncapped Third-Party NIL into capped institutional spending.

220.    Ohio State provides a concrete illustration of how this conversion has worked. According to Ohio State Athletic Director Ross Bjork, donor-led Associated Third Parties recently paid "around $20 million" in NIL compensation to Ohio State football players alone in a single year, a figure believed to be among the highest in college sports.[55] At the same time, under the Settlement, Ohio State's own annual revenue-sharing cap for all of its athletes is approximately $20.5 million. Absent the Agreement, Ohio State athletes could have received at least $20.5 million in Direct Pay NIL and revenue-sharing payments on top of roughly $20 million in Third-Party NIL. This would bring Ohio State athletes' NIL earnings to more than $40 million in total. Instead, by folding its two successful Associated Third Parties into a new internal unit, Buckeye Sports Group, and treating those donor funds as part of the capped institutional bucket, Ohio State effectively repurposed previously independent NIL payments into cost savings for the school. The associated-entity label and related restrictions thus function not to protect "amateurism" or competitive balance, but to re-monopolize booster and collective dollars and to justify denying athletes NIL compensation that state law would otherwise permit.

221.    Second, Defendants may assert that the Agreement is needed to promote "competitive balance." On its face, such a claim is meritless. The pre-Settlement patchwork of state NIL laws already created state-by-state variation without destroying or even undercutting competitive college athletics, and Defendants' own acknowledgment that federal legislation, not a settlement agreement, was required to override state law confirms they had no legitimate authority to proceed as they did.

222.    State-law compliance would not require Defendants to expel or boycott member schools. The threat of conference expulsion in the enforcement structure is itself part of the coercive mechanism that suppresses athlete compensation and constitutes anticompetitive conduct. At the same time, the implausibility that conferences would expel flagship members such as USC, UCLA, Stanford, and UC

---

[55] *See* Cameron Salerno, *Ohio State Players Received "Around $20 Million" in NIL, Believed to Be Largest Amount in College Football*, CBS Sports (July 24, 2024), https://www.cbssports.com/college-football/news/ohio-state-players-received-around-20-million-in-nil-believed-to-be-largest-amount-in-college-football/.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

Berkeley for complying with California law, or other flagship schools in other Power Four conferences, confirms that no legitimate procompetitive justification requires the expulsion threat in the first place. Defendants cannot credibly claim that conference integrity demands threatening expulsion for state-law compliance when they would not and could not act on that threat against their most commercially valuable members.

223. As the CSC has implemented them, moreover, the NIL Restrictions imposed by the Settlement and embodied in the revised NCAA rules do not restrict the NIL paid by third parties other than Associated Third Parties. In other words, for third parties other than Associated Third Parties, market forces determine NIL values. With NIL values dependent in part on the school an athlete chooses to attend, third parties other than Associated Third Parties, including publicly traded for-profit corporations worth billions of dollars, may condition the amounts of NIL they are willing to pay athletes on where they play, and thereby engage in the very type of conduct that Defendants claim they mean to prevent in order to supposedly create a level playing field.[56]

224. Third, Defendants may contend that the Agreement is necessary to prevent improper NIL "inducements" for recruits and transfers. But in resolving litigation brought by multiple state attorneys general, the NCAA has already agreed to eliminate its prior ban on NIL arrangements with recruits before enrollment.[57] This settlement reflects that broad bans on Associated Third-Party NIL "inducements" are not necessary.

225. At the same time that Defendants treat NIL paid directly by schools and direct payments that are conditioned on a recruit's enrollment or a current athlete's continued participation on a particular team as permissible inducements, they bar independent Associated Third Parties, who cannot admit a

---

[56] The IRS defines "Associated Entity or Individual" to cover boosters and their insiders and big donors. *See* IRS, Art. 1, § 1(c). The definition expressly excludes "a publicly traded corporation" from that category, even when it is "owned, controlled, or operated by, or otherwise affiliated with," those individuals or entities. *Id.* The settlement's required NIL rules then limit only "NIL payments by Associated Entities or Individuals" unless they are for a valid business purpose and at market-comparable terms. *See id.* Art 4, § 3. There is no parallel restriction on independent third-party companies that do not qualify as "Associated Entities or Individuals."

[57] *See NCAA Settles Lawsuit with States Over NIL Rules for Recruits*, ESPN (Jan. 31, 2025), https://www.espn.com/college-sports/story/_/id/43643716/ncaa-settles-lawsuit-tennessee-virginia-compensation-rules-recruits.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

student to a school or decide who plays on a team, from making parallel, lawful offers. This is the case even though Associated Third Parties lack any power to control enrollment or roster decisions. Whatever rhetorical force "inducement" may have had in the settlement context, it cannot justify the post-Settlement implementation of the NIL-fixing and group-boycott restraints challenged here.

**COUNT II**
**CALIFORNIA'S CARTWRIGHT ACT**
**CAL. BUS. & PROF. CODE § 16700 *ET SEQ.***
<u>**ON BEHALF OF THE CALIFORNIA CLASSES**</u>

226. Plaintiffs incorporate the allegations above.

227. The Agreement constitutes unlawful price-fixing and group boycott under the Cartwright Act, whether under the quick look or full rule of reason mode of analysis.

228. The Agreement has had an anticompetitive effect through the suppression of NIL compensation received by Plaintiffs and the other California Class members.

229. Plaintiffs and the other California Class members have suffered antitrust injury because suppression of NIL compensation is a type of injury the antitrust laws were designed to prevent and flows from the Agreement.

230. The Agreement has been willful and intentional. In particular, before the Court approved the Settlement and when the revised NCAA rules went into effect, Defendants knew that the implementation of the new NIL Restrictions and the revised NCAA rules, through the CSC's enforcement, would conflict with the NIL laws in the NIL Rights States. Defendants nonetheless agreed to implement those NIL Restrictions.

231. There are no procompetitive justifications for the Agreement. If there were, such justifications do not outweigh the anticompetitive effects of the Agreement.

**COUNT III**
**PREDICATE VIOLATION OF CALIFORNIA'S NIL LAW**
**CAL. EDUC. CODE § 67456**
**FOR PURPOSES OF INDEPENDENT WRONGFULNESS UNDER COUNT IV**
<u>**ON BEHALF OF THE CALIFORNIA CLASSES**</u>

232. Plaintiffs incorporate the allegations above.

62

233. The Agreement, which voluntarily imposes and enforces the NIL Restrictions on all Division I schools in California and the college athletes attending those schools, violates California's NIL Law in two respects.

234. First, the law prohibits "[a]n athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association" from "prevent[ing] a student of a postsecondary educational institution participating in intercollegiate athletics from earning compensation as a result of the use of the student's name, image, likeness, or athletic reputation." Cal. Educ. Code § 67456(a)(2). By implementing the NIL Restrictions in California, which hinder, restrict, and prevent students from earning NIL compensation, Defendants have violated this prohibition.

235. Second, the law prohibits "[a]n athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association" from "prevent[ing] a postsecondary educational institution from participating in intercollegiate athletics as a result of the compensation of a student athlete for the use of the student's name, image, likeness, or athletic reputation." *Id*. § 67456(a)(3). This statute prohibits the Agreement, which deters California schools from exceeding the Direct Pay Cap, or from having on their rosters athletes whose NIL payments from Associated Third Parties do not comply with the Associated Third-Party NIL Compensation Restrictions.

236. Plaintiffs do not assert a private right of action for damages under the California NIL Law in this count. Whether the Fair Pay to Play Act creates such a right is a question Plaintiffs reserve. This count is pled for a specific and limited purpose: to establish that Defendants' conduct was independently wrongful, through the violation of a specific California statutory prohibition, other than the fact of interference with Plaintiffs' prospective economic relationships. That independent wrongfulness is a required element of Plaintiffs' claim for tortious interference with prospective economic advantage, set forth in Count IV below.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

## COUNT IV
## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE ECONOMIC ADVANTAGE
## ON BEHALF OF THE CALIFORNIA CLASSES

237. Plaintiffs incorporate the allegations above.

**A.     The Prospective Economic Relationships at Issue**

238. Plaintiffs and members of the California Classes had "relationships, expectancies, and probable future economic benefits," including: (a) direct NIL compensation arrangements with their schools; and/or (b) NIL compensation arrangements with Associated Third Parties, including collectives and other third parties affiliated with their schools.

239. The Agreement undermined prospective lucrative NIL compensation arrangements. Absent the NIL Restrictions, the members of the California Associated Third-Party NIL Class would have received NIL compensation from Associated Third Parties. For instance, Plaintiff Mirer received NIL compensation from the Lifetime Cardinal collective in 2023 and 2024. Under the revised NCAA rules implemented by Defendants after the approval of the Settlement, he has received no compensation from any collective, nor any direct NIL compensation from Stanford. The Agreement has suppressed, deterred, and effectively terminated the economic relationships that had produced his prior NIL compensation.

240. The Agreement has also disrupted, reduced, capped, conditioned, or terminated the ongoing economic relationships that the members of the California Direct Pay NIL Class had with their schools. These relationships were protected under California's Fair Pay to Play Act, which grants California college athletes the right to earn NIL compensation without interference from athletic associations or conferences.

**B.     Defendants' Knowledge of the Relationships**

241. Defendants had actual and specific knowledge of the prospective NIL relationships of Plaintiffs and members of both California Classes. That knowledge is established by, among other things: (a) the NIL Go clearinghouse, operated by the CSC and designed by Defendant Seeley with the involvement of Defendant Baker and the NCAA, which required California college athletes to report all NIL deals valued at $600 or more (through NIL Go, Defendants received actual notice of the specific NIL

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

arrangements entered into by California athletes, including those at USC, UCLA, Stanford, and UC Berkeley); (b) the affiliation agreements and UPA that Defendants circulated to California schools that were designed to regulate and restrict the very NIL compensation arrangements between athletes and their schools and/or Associated Third Parties that Defendants knew existed at those schools; and (c) Defendants' own public statements acknowledging that state NIL laws, including California's, protected existing NIL compensation arrangements that conflicted with the NIL Restrictions they were implementing.

242.    Defendants understood that California law, specifically, the Fair Pay to Play Act, protected college athletes' ability to enter into and receive compensation under these NIL arrangements without interference from athletic associations or conferences, and that their implementation of the NIL Restrictions was directly contrary to that protection.

**C.    Civil Conspiracy and Concert of Action Among All Defendants**

243.    Before and through the Agreement, Defendants—including the NCAA, each of the Conference Defendants, and each of the Individual Defendants—formed and participated in a civil conspiracy and scheme, the object of which was to design, implement, and enforce NIL compensation restrictions in California that each of them knew violated California law and would suppress the NIL compensation to which California college athletes were entitled under the Fair Pay to Play Act and California common law.

244.    The conspiracy and scheme were formed no later than June 6, 2025, when the Institutional Defendants and Individual Defendants jointly agreed to implement the NIL Restrictions through coordinated rulemaking, enforcement infrastructure, and member-school compliance mechanisms, knowing that such restrictions were contrary to California law.

245.    In furtherance of the conspiracy, each Defendant took one or more overt acts, including but not limited to: (a) designing and implementing the Direct Pay Cap and associated NIL restrictions; (b) creating and operating the NIL Go clearinghouse as a gatekeeping and enforcement mechanism; (c) circulating the affiliation agreements and UPA to California member schools; and (d) directing and

65

overseeing compliance by California member schools with NIL restrictions that suppressed the compensation of Plaintiffs and the members of California Classes.

246. Defendants each knowingly and voluntarily participated in the conspiracy and scheme, acted in concert with every other Defendant pursuant to a common plan and design to suppress California athletes' NIL compensation, and took affirmative steps in furtherance of that common plan. Defendants are jointly and severally liable for all harm caused to Plaintiffs and members of the California Classes arising from any act taken by any co-conspirator in furtherance of the conspiracy, regardless of which Defendant's act proximately caused any particular harm.

247. In addition and in the alternative, all Defendants acted in concert pursuant to a common design to implement and enforce the NIL Restrictions challenged herein. Under California's concert of action doctrine, each Defendant who acts in concert with others pursuant to a common plan to commit a tortious act is jointly and severally liable for all resulting harm, whether or not each Defendant personally performed every act constituting the interference. Each Defendant herein participated in, approved, directed, or ratified the common plan to suppress California athletes' NIL compensation, and is therefore jointly and severally liable for the full amount of harm suffered by Plaintiffs and members of the California Classes.

### D. Intentional Interference

248. Defendants intentionally and voluntarily implemented the NIL Restrictions—including the Direct Pay Cap, the Associated Third-Party NIL Compensation Restrictions, and the NIL Go gatekeeping mechanism that limited, capped, conditioned, deterred, delayed, prevented, or otherwise suppressed NIL compensation owed to California college athletes under their existing and prospective NIL arrangements.

249. Defendants' interference was not incidental or inadvertent. Each of the Individual Defendants made public statements confirming his actual knowledge that the NIL Restrictions conflicted with the California NIL Law, and each proceeded to implement those restrictions in California anyway. By implementing restrictions known to violate California law that deliberately affected economic relationships known to be protected by that law, Defendants pursued a course of conduct that constitutes intentional interference as a matter of law.

250. To the extent Plaintiffs or members of the California Associated Third-Party NIL Class had prospective economic relationships reasonably probable of resulting in NIL compensation, including the relationships with collectives, Associated Third Parties, and their schools that existed prior to the Settlement's approval, Defendants' conduct intentionally disrupted those prospective relationships, preventing them from ripening into compensation that California law protects.

**E.    Independent Wrongfulness**

251. Defendants' conduct was independently wrongful, relevant to the interference with prospective economic advantage claim, for the following reasons.

252. Defendants' conduct violated California's NIL Law, Cal. Educ. Code § 67456, which prohibits athletic associations and conferences from preventing or restricting California college athletes from earning NIL compensation. Defendants are precisely the entities the statute targets, and their implementation of the NIL Restrictions is conduct the statute prohibits.

253. Defendants' conduct violated the California Cartwright Act, as set forth in Count II herein, providing an additional and independent basis of wrongfulness.

254. Defendants' conduct violated the clearly established public policy of California, as reflected in the Fair Pay to Play Act and its legislative history, which statute the California legislature enacted to protect college athletes at California schools from exploitation by the NCAA and athletic conferences and to ensure that those organizations could not suppress or restrict athletes' NIL compensation. A defendant's interference that contravenes an established public policy of the forum state constitutes independently wrongful conduct under California law.

255. Defendants' conduct was not privileged. The implementation of the NIL Restrictions in California was not required by the Settlement, and neither the Settlement nor any federal law required or allowed Defendants to override California's NIL Law. Defendants acted voluntarily and without legal compulsion or justification in implementing restrictions that they knew violated California law and the rights of the members of both California Classes.

### F. Causation and Damages

256. As a direct and proximate result of Defendants' intentional interference, Plaintiffs and members of the California Classes suffered economic harm in the form of reduced, delayed, capped, or entirely foregone NIL compensation that they would have received in a competitive market absent the NIL Restrictions.

257. The harm Plaintiffs suffered is representative of the harm suffered by the members of the California Classes. Ili would have received multi-year NIL compensation from the House of Victory collective but for the NIL Restrictions; instead, that offer evaporated because of the approval of the Settlement. Mirer received NIL compensation from the Lifetime Cardinal collective in prior years, but he has received no collective or direct school compensation under the revised NCAA rules. Both Plaintiffs, and all California Class members, have been injured in the same way.

258. The Agreement injured California Class members. Defendants implemented NIL restrictions that they knew violated California law; those restrictions capped, conditioned, deterred, and suppressed NIL compensation at California schools; and Plaintiffs and California Class members received less NIL compensation than they would have received in a free and competitive market governed by California law.

### G. Individual Defendants' Aiding and Abetting Liability

259. The Individual Defendants—Baker, Petitti, Phillips, Sankey, Yormark, and Seeley—each acted with actual knowledge that Defendants' implementation of the NIL Restrictions in California violated California law and would cause economic harm to California college athletes by suppressing and preventing their NIL compensation.

260. The Individual Defendants each substantially assisted the Institutional Defendants' tortious interference by personally authorizing, directing, designing, and overseeing the implementation of the NIL Restrictions in California, as set forth in detail in the personal jurisdiction allegations above, which are incorporated herein by reference.

261. The Individual Defendants each made affirmative and knowing contributions to the scheme: among other actions referenced above, Baker directed the NCAA's Bylaw amendments and NIL

Go implementation; Petitti directed implementation against Big Ten member schools UCLA and USC; Phillips directed implementation against ACC member schools Stanford and UC Berkeley; Sankey and Yormark, respectively, coordinated the SEC and Big 12's creation, co-ownership, and oversight of the CSC; and Seeley personally designed and operates the enforcement infrastructure through which the NIL Restrictions are imposed on California athletes.

262. The Individual Defendants are each therefore liable under California law for aiding and abetting the Institutional Defendants' interference with the prospective economic relationships of Plaintiffs and the members of both California Classes. The Individual Defendants' liability under this section is in addition to, and not in limitation of, their joint and several liability as co-conspirators and participants in the concerted action alleged above.

**COUNT V**
**LIMITED INJUNCTIVE RELIEF PURSUANT TO**
**SECTION 16 OF THE CLAYTON ACT, 15 U.S.C. § 26**
**ON BEHALF OF THE FEDERAL CLASSES**

263. Plaintiffs incorporate the allegations above.

264. Section 16 of the Clayton Act, 15 U.S.C. § 26, provides that any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief against threatened loss or damage by a violation of the antitrust laws, including the Sherman Act.

265. Defendants have engaged and continue to engage in a horizontal conspiracy to suppress student athlete NIL compensation in the NIL Rights States through coordinated rules and implementation practices that violate Section 1 of the Sherman Act, the California Cartwright Act, the California Fair Pay to Play Act, and constitute tortious interference with prospective economic advantage in the NIL Rights States. Plaintiffs are entitled to injunctive relief pursuant to Section 16 of the Clayton Act prohibiting Defendants from enforcing, implementing, or giving effect to any restriction on student athlete NIL compensation in the NIL Rights States that constitutes a violation of the foregoing laws.

266. Defendants' unlawful conduct is ongoing and continuing. During each academic year of their athletic eligibility, Plaintiffs and members of the proposed Class are subjected to NIL compensation restrictions that exceed the authorization of the IRS and violate the laws of the NIL Rights States. Absent

injunctive relief, Plaintiffs and Class members will continue to suffer suppression of their NIL compensation in future academic years, including the 2026-27 academic year and thereafter through the duration of Defendants' ongoing conspiracy.

267. The threatened and ongoing harm to Plaintiffs and Class members is not fully compensable through damages alone. Defendants' continuing suppression of NIL compensation affects recruiting decisions, transfer decisions, athletic career development, and NIL market opportunities that cannot be fully monetized or restored after the fact. Each academic year that passes without injunctive relief represents irreplaceable lost opportunity for student athletes whose eligibility windows are finite and non-renewable.

268. Plaintiffs and the Class members have no adequate remedy at law for the ongoing and future harm caused by Defendants' continuing violations. A damages award addressing historical harm would not prevent Defendants from continuing to suppress NIL compensation in the NIL Rights States in future years, and requiring Plaintiffs to file successive damages actions for each year of continuing violation would be contrary to judicial economy and inadequate to provide complete relief.

269. The injunctive relief sought herein does not constitute a challenge to the Injunctive Relief Settlement Agreement approved by this Court, its structure, its terms, or its continuation through June 2035. Plaintiffs do not seek to modify, vacate, disturb, or supersede the IRS or the benefits flowing to settlement class members thereunder. Plaintiffs' claims for injunctive relief arise solely from Defendants' implementation of the IRS in the NIL Rights States in excess of its authorization and in violation of applicable state law. The IRS does not authorize, require, or protect the implementation conduct challenged herein, and this action does not challenge the lawfulness of the IRS itself or this Court's approval thereof.

270. Plaintiffs are further entitled to such prospective structural relief as may be necessary to prevent recurrence of Defendants' unlawful conduct and to remedy the ongoing competitive harm to Plaintiffs and Class members in the NIL Rights States, including but not limited to relief requiring Defendants to establish and maintain a process for determining student athlete NIL compensation and revenue share in the NIL Rights States through means that comply with applicable state law, do not involve

horizontal coordination among competing institutions in violation of Section 1 of the Sherman Act, and provide student athletes in the NIL Rights States with a meaningful voice in the determination of the terms and conditions of their NIL compensation. Such relief should take account of the fact the effects of the Agreement extend beyond the NIL Rights States.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, and grant the following relief:

(a)  An order certifying each of the four Classes pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Class Counsel;

(b)  An order adjudging that Defendants violated Section 1 of the Sherman Act;

(c)  An order awarding treble damages to Plaintiffs and the members of both proposed Federal Classes under the Sherman Act, 15 U.S.C. § 15;

(d)  An order adjudging that Defendants violated California's Cartwright Act;

(e)  An award of treble damages, costs, and reasonable attorneys' fees to Plaintiffs and the California Classes under the Cartwright Act, Cal. Bus. & Prof. Code § 16750(a);

(f)  A finding and judgment that Defendants' implementation of the NIL Restrictions in California violates California's Fair Pay to Play Act, Cal. Educ. Code § 67456, and that the Agreement constitutes unlawful interference with prospective economic relationships under California law;

(g)  An award of all such damages against each Defendant arising from Defendants' tortious interference with prospective economic advantage, as each Defendant acted in concert with, and as a co-conspirator of, the other Defendants in causing the harm alleged herein to Plaintiffs and members of the California Classes;

(h)  A finding and judgment that Defendants' violations of California state law were willful and intentional, as alleged herein, which finding is relevant to the award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5 and to any other relief to which such a finding is pertinent;

(i)     Pre-judgment and post-judgment interest on all monetary awards at the maximum rate permitted by law;

(j)     A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, prohibiting Defendants, their officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from enforcing, implementing, or giving effect to any restriction on student athlete NIL compensation in the NIL Rights States that exceeds the authorization of the Injunctive Relief Settlement Agreement approved in *In Re College Athlete NIL Litigation*, No. 4:20-cv-03919-CW, or that violates the NIL rights legislation of any NIL Rights State;

(k)     Such further prospective structural relief as may be necessary to prevent recurrence of Defendants' unlawful conduct and to provide complete relief against the conspiracy at its source, including but not limited to relief requiring Defendants to establish and maintain a process for determining student athlete NIL compensation through means that comply with applicable state law and provide student athletes in the NIL Rights States with a meaningful voice in such determination, the specific form of which Plaintiffs reserve the right to propose following a finding of liability;

(l)     A declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Defendants' implementation of NIL compensation restrictions in the NIL Rights States as alleged herein violates Section 1 of the Sherman Act, the California Cartwright Act, the California Fair Pay to Play Act, and the unfair competition laws of the NIL Rights States; and

(m)     An award of reasonable attorneys' fees and costs pursuant to the Sherman Act, 15 U.S.C. § 15, and California Code of Civil Procedure § 1021.5, on the ground that this action enforces important rights affecting the public interest—specifically, the right of California college athletes to earn NIL compensation free from unlawful interference by athletic associations and conferences, and confers a significant benefit on a large class of persons and the general public.

## VIII.   JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

Dated: June 9, 2026

Respectfully submitted,

By: /s/ *Joshua P. Davis*
Joshua Davis (Cal. Bar No. 193254)
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Tel: (415) 906-0684
jdavis@bergermontague.com

Eric L. Cramer (*pro hac vice pending*)
**BERGER MONTAGUE PC**
1818 Market St., Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
ecramer@bergermontague.com

Robert E. Litan (*pro hac vice pending*)
**BERGER MONTAGUE PC**
1001 G Street, NW, Suite 400 East
Washington, DC 20001
Tel: (202) 559-9745
rlitan@bergermontague.com

Edward Normand (*pro hac vice pending*)
Richard Cipolla (*pro hac vice pending*)
Stephen Lagos (*pro hac vice pending*)
**FREEDMAN NORMAND FRIEDLAND LLP**
155 E. 44th Street, Suite 915
New York, NY 10021
Tel: (646) 494-2900
tnormand@fnf.law
rcipolla@fnf.law
slagos@fnf.law

*Counsel for Plaintiffs and the Proposed Classes*

CLASS ACTION COMPLAINT
Case No. 3:26-cv-05562

## APPENDIX A

| NIL Rights State | Statutory Citation | Provision(s) Prohibiting the NCAA and Athletic Conferences from Interfering with College Athletes' NIL Compensation | Provision(s) Prohibiting the NCAA and Athletic Conferences from Penalizing Colleges for Permitting College Athletes to Receive NIL Compensation |
|---|---|---|---|
| Arizona | A.R.S. § 15-1892 | (G): A regulator[1] may not do any of the following:<br>(1): Prevent a student athlete from fully participating in an intercollegiate athletic program because the student athlete does any of the following:<br>• (a): Earns compensation for the use of the student athlete's own name, image or likeness<br>(5): Take either of the following actions against an individual, third-party entity or student athlete for a violation of the regulator's rules or regulations relating to compensation for the use of a student athlete's own name, image or likeness:<br>• (a): Impose a penalty against a postsecondary education institution or student athlete<br>• (b): Prevent the postsecondary education institution or student athlete from participating in an intercollegiate athletic program | (G): A regulator may not do any of the following:<br>(2): Prevent a postsecondary education institution from doing any of the following because a student athlete who participates in an intercollegiate athletic program at the postsecondary education institution engages in one or more of the activities described in paragraph 1 of this subsection:<br>• (a): Becoming a member of any regulator that is a membership organization<br>• (b): Participating in one or more intercollegiate athletic programs that are sponsored by the regulator<br>(4): Consider a complaint, initiate an investigation or take any adverse action against a postsecondary education institution, institutional marketing associate or third-party entity for engaging in any conduct authorized under this section |
| California | Cal. Educ. Code § 67456 | (a)(2): An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, shall not prevent a student of a postsecondary educational institution participating in intercollegiate athletics from earning compensation as a result of the | (a)(3): An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association, shall not prevent a postsecondary educational institution from participating in intercollegiate athletics as a result of the compensation of a student athlete for the use of the student's |

---

[1] A "regulator" is defined in Section (O)(6) of this statute as "any organization with authority over one or more intercollegiate athletic programs," "includ[ing] an athletic conference and association for promoting or regulating collegiate athletic programs."

1

| | | | |
|---|---|---|---|
| | | use of the student's name, image, likeness, or athletic reputation. | name, image, likeness, or athletic reputation. |
| Connecticut | C.G.S.A. § 10a-56 | (e): No athletic association or conference, including, but not limited to, the NCAA, on the basis of a student athlete's endorsement contract, employment activity, revenue sharing agreement or representation by an attorney or sports agent pursuant to subsection (b) of this section, shall<br><br>• (2): restrict or revoke a student athlete's eligibility to participate in an intercollegiate athletic program<br>• (3): prohibit or prevent a student athlete from earning compensation from such endorsement contract, employment activity or revenue sharing agreement | (e): No athletic association or conference, including, but not limited to, the NCAA, on the basis of a student athlete's endorsement contract, employment activity, revenue sharing agreement or representation by an attorney or sports agent pursuant to subsection (b) of this section, shall<br><br>• (1): prohibit or prevent an institution of higher education or its intercollegiate athletic program from participating in intercollegiate sports<br>• (5): take action on a complaint, open an investigation or take any adverse action against an institution of higher education, an entity acting on behalf of such institution, an employee of such institution or a student athlete for activity permitted under this section, including, but not limited to, direct compensation of a student athlete through an endorsement contract or a revenue sharing agreement |
| Maryland | Md. Code, Educ. § 15-131 | (b)(2): An athletic association, a conference, or any other group or organization with authority over intercollegiate athletics, including the National Collegiate Athletic Association, may not prevent a student athlete from earning compensation as a result of the use of the student athlete's name, image, or likeness. | (b)(3): An athletic association, a conference, or any other group or organization with authority over intercollegiate athletics, including the National Collegiate Athletic Association, may not prevent a public institution of higher education from participating in intercollegiate athletics as a result of the compensation of a student athlete for the use of the student athlete's name, image, or likeness. |
| Michigan | M.C.L.A. § 390.1732 | An athletic association, conference, or other group or organization with authority over intercollegiate athletics, | An athletic association, conference, or other group or organization with authority over intercollegiate athletics, |

APPENDIX A
Case No. 3:26-cv-05562

|  |  | including, but not limited to, the National Collegiate Athletic Association, shall not . . . : (a): Prevent a student of a postsecondary educational institution from fully participating in intercollegiate athletics based upon the student earning compensation as a result of the student's use of his or her name, image, or likeness rights | including, but not limited to, the National Collegiate Athletic Association, shall not . . . : (b): Prevent a postsecondary educational institution from fully participating in intercollegiate athletics without penalty based upon a student's use of his or her name, image, or likeness rights |
|---|---|---|---|
| Mississippi | Miss. Code Ann. § 37-97-101 *et seq*. | § 37-97-105(2): A postsecondary educational institution or any officer, trustee or employee of a postsecondary educational institution shall have the right to identify, create, solicit, facilitate, negotiate, support, assist and otherwise enable opportunities for a student-athlete to earn or attempt to earn compensation for the use of the student-athlete's publicity rights.[2] Such right shall include, without limitation, the right to discuss with a student-athlete the potential to earn compensation for his or her publicity rights if he or she attends the postsecondary educational institution.<br><br>§ 37-97-105(3): A third party shall have the right to compensate a student-athlete for the use of the student-athlete's publicity rights.<br><br>§ 37-97-109(2): A national association, a conference or any other group or organization with authority over the sport, that promotes or regulates collegiate athletics at a postsecondary educational institution to which this chapter applies shall not: (a): Enforce a contract term, a rule, a regulation, a standard, a bylaw, guidance, or any other requirement that penalizes the | § 37-97-105(2): A postsecondary educational institution or any officer, trustee or employee of a postsecondary educational institution shall have the right to identify, create, solicit, facilitate, negotiate, support, assist and otherwise enable opportunities for a student-athlete to earn or attempt to earn compensation for the use of the student-athlete's publicity rights. Such right shall include, without limitation, the right to discuss with a student-athlete the potential to earn compensation for his or her publicity rights if he or she attends the postsecondary educational institution.<br><br>§ 37-97-105(3): A third party shall have the right to compensate a student-athlete for the use of the student-athlete's publicity rights.<br><br>§ 37-97-109(2): A national association, a conference or any other group or organization with authority over the sport, that promotes or regulates collegiate athletics at a postsecondary educational institution to which this chapter applies shall not: (a): Enforce a contract term, a rule, a regulation, a standard, a bylaw, guidance, or any other requirement that penalizes the |

---

[2] The phrase "publicity rights" is defined in Section 37-97-103(c) of this statute as "any right associated with the name, image, likeness, publicity, reputation, fame, or personal following of a student recognized under federal or state law as permitting an individual to control or profit from the use of the same."

APPENDIX A
Case No. 3:26-cv-05562

| | | | |
|---|---|---|---|
| | | institution, the institution's intercollegiate athletics program, or student-athlete for performing, participating in, or allowing an activity required or authorized by this chapter | institution, the institution's intercollegiate athletics program, or student-athlete for performing, participating in, or allowing an activity required or authorized by this chapter<br>(b): Prevent a postsecondary educational institution from or penalize it for establishing agreements with a third-party entity to act on the institution's behalf to identify, create, solicit, facilitate, negotiate, support, assist, and otherwise enable opportunities for a student-athlete to earn compensation from his or her publicity rights<br>(c): Penalize a postsecondary educational institution because an individual or entity whose purpose includes supporting and benefiting the postsecondary institution or its intercollegiate athletic programs violates any contract term, a rule, a regulation, a standard, a bylaw, guidance, or any other requirement that is in conflict with actions required or authorized by this chapter |
| Nevada | N.R.S. 398.300 | (3): A national collegiate athletic association shall not:<br>(a): Prevent a student athlete enrolled at an institution from participating in intercollegiate sports solely because the student athlete is compensated for the use of the name, image or likeness of the student athlete by an organization, the institution or the national collegiate athletic association | (3): A national collegiate athletic association shall not:<br>(b): Prevent an institution from being a member of or participating in the activities of the national collegiate athletic association solely because a student athlete who is enrolled at the institution is compensated for the use of the name, image or likeness of the student athlete by an organization, the institution or the national collegiate athletic association |
| New Jersey | N.J.S.A. 18A:3B-89.6 | (a): An athletic association, conference with member institutions that offer athletic scholarships, or other group or organization with authority over intercollegiate athletics including, but not limited to, the National Collegiate Athletic Association, shall not: | (a): An athletic association, conference with member institutions that offer athletic scholarships, or other group or organization with authority over intercollegiate athletics including, but not limited to, the National Collegiate Athletic Association, shall not: |

4

| | | | |
|---|---|---|---|
| | | (3): penalize a four-year institution of higher education or student-athlete, or prevent a four-year institution of higher education or student-athlete from participating in intercollegiate athletics, because an individual or related entity whose purpose includes supporting or benefiting the institution or student-athletes violates its rules or regulations concerning name, image, or likeness | (1): prohibit or prevent a four-year institution of higher education from becoming a member of the association, conference, or organization, or participating in intercollegiate athletics sponsored by the association, conference, or organization, as a consequence of any student-athlete earning compensation for the use of the student-athlete's name, image, or likeness or obtaining representation by an athlete agent or attorney in connection with issues related to name, image, or likeness<br>(2): take any other adverse action against a four-year institution of higher education or any other related entity of an institution, for activity permitted pursuant to this act<br>(3): penalize a four-year institution of higher education or student-athlete, or prevent a four-year institution of higher education or student-athlete from participating in intercollegiate athletics, because an individual or related entity whose purpose includes supporting or benefiting the institution or student-athletes violates its rules or regulations concerning name, image, or likeness |
| New York | McKinney's Education Law § 6438-c | (2)(b): An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the National Collegiate Athletic Association (NCAA), shall not prevent a student-athlete from earning compensation pursuant to this section as a result of the use of the student-athlete's name, image, or likeness. | (2)(c): An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to, the NCAA, shall not prevent a college from:<br>• (i): participating in intercollegiate athletics as a result of allowing a student-athlete pursuant to this section from earning compensation as a result of the use of the student-athlete's name, image, or likeness |

|  |  |  | (d): An athletic association, conference, or other group or organization with authority over intercollegiate athletics, including, but not limited to the NCAA, shall not and shall not authorize its member institutions to:<br>• (i): prevent a college from participation in intercollegiate athletics because a student-athlete in attendance has previously earned or intends to earn compensation for the use of his or her name, image, or likeness<br>• (ii): entertain a complaint, open an investigation, or take any other adverse action against a college for engaging in any activity protected in this section or for involvement in a student-athlete's name, image, or likeness<br>• (iii) penalize or prevent a college from participation in intercollegiate athletics because an individual or entity whose purpose includes supporting or benefitting the college or its athletic programs or student-athletes violates the collegiate athletic association's rules or regulations with regard to a student-athlete's name, image, or likeness |
|---|---|---|---|
| Ohio | R.C. § 3376.01 *et seq*. | § 3376.03: An athletic association, conference, or other group or organization with authority over intercollegiate athletics shall not do any of the following:<br>(A): Prevent a student-athlete of a state institution of higher education or private college from fully participating in intercollegiate athletics because | § 3376.03: An athletic association, conference, or other group or organization with authority over intercollegiate athletics shall not do any of the following:<br>(B): Prevent a state institution of higher education or private college from becoming a member of the athletic association, conference, or other group or organization or from participating |

APPENDIX A
Case No. 3:26-cv-05562

| | | | |
|---|---|---|---|
| | | the student-athlete does either of the following:<br>• (1): Earns compensation as a result of the use of the student-athlete's name, image, or likeness or any other compensation related to the student-athlete's position on the roster of an intercollegiate athletics team<br>(D): Penalize a state institution of higher education, private college, or student-athlete, or prevent the institution, college, or student-athlete from participating in intercollegiate athletics, because another individual or third-party entity whose purpose includes supporting or benefiting the institution, college, or student-athlete violates a rule or regulation of the athletic association, conference, or other group or organization that addresses compensation for use of a student-athlete's name, image, or likeness.<br><br>§ 3376.04: No state institution of higher education, private college, athletic association, conference, or other group or organization with authority over intercollegiate athletics shall do any of the following:<br>(A): Prevent a student-athlete from earning compensation for use of the student-athlete's name, image, or likeness if the student-athlete earns that compensation in accordance with this chapter | in intercollegiate athletics sponsored by the athletic association, conference, or other group or organization because a student-athlete of that institution or college participating in intercollegiate athletics does either of the following:<br>• (1) Earns compensation from the use of the student-athlete's name, image, or likeness or any other compensation related to the student-athlete's position on the roster of an intercollegiate athletics team<br>(C): Consider a complaint, initiate an investigation, or take any adverse action against a state institution of higher education, private college, institutional marketing associate, or third-party entity for engaging in any conduct authorized under this chapter<br>(D): Penalize a state institution of higher education, private college, or student-athlete, or prevent the institution, college, or student-athlete from participating in intercollegiate athletics, because another individual or third-party entity whose purpose includes supporting or benefiting the institution, college, or student-athlete violates a rule or regulation of the athletic association, conference, or other group or organization that addresses compensation for use of a student-athlete's name, image, or likeness |
| Oregon | O.R.S. § 702.200 | (2): A post-secondary institution of education may compensate a student athlete or prospective student athlete for use of the student athlete's or prospective student athlete's name, image, likeness or athletic reputation.<br>(3)(a): Except as provided in this section, a post-secondary institution of education or an athletic association, conference or | (3)(b): Except as provided in this section, an athletic association, conference or organization with authority over intercollegiate sports may not:<br>(A): Prevent a post-secondary institution of education or a student athlete from participating in intercollegiate sports, accept a complaint, open an investigation or take any other adverse action |

| | | | | |
|---|---|---|---|---|
| | | organization with authority over intercollegiate sports may not:<br>(A): Prohibit, prevent or restrict a student athlete from exercising economic rights<br>(B): Penalize or retaliate against a student athlete for exercising economic rights<br>(C): Prohibit a student athlete from participating in an intercollegiate sport for exercising economic rights<br>(D) Impose an eligibility requirement on a scholarship or grant that requires a student athlete to refrain from exercising economic rights<br>(E) Prohibit a student athlete from receiving food, drink, lodging or medical expenses or insurance coverage from a third party as compensation for use of the student athlete's name, image, likeness or athletic reputation<br>(3)(b): Except as provided in this section, an athletic association, conference or organization with authority over intercollegiate sports may not:<br>(A): Prevent a post-secondary institution of education or a student athlete from participating in intercollegiate sports, accept a complaint, open an investigation or take any other adverse action against a post-secondary institution of education or a student athlete as a result of a violation, or an alleged violation, of the rules or regulations of the athletic association, conference or organization related to a student athlete exercising economic rights | against a post-secondary institution of education or a student athlete as a result of a violation, or an alleged violation, of the rules or regulations of the athletic association, conference or organization related to a student athlete exercising economic rights |
| Pennsylvania | 24 P.S. § 20-2003-M | (c): An athletic association, conference or other group or organization with authority over intercollegiate athletics, including the NCAA, may not:<br>(1): Prevent a college student athlete from earning compensation through the use or license of the college student | (c): An athletic association, conference or other group or organization with authority over intercollegiate athletics, including the NCAA, may not:<br>(2): Prevent an institution of higher education from fully participating in intercollegiate athletics as a result of a college student athlete's use of the college |

8

| | | athlete's name, image or likeness rights<br>(3): Entertain a complaint, open an investigation or take any other adverse action against an institution of higher education, or an entity acting on its behalf, an employee of an institution of higher education or a college student athlete for activity permitted under this article or for directly compensating a college student athlete for use of the college student athlete's name, image or likeness | student athlete's name, image or likeness rights to seek compensation<br>(3): Entertain a complaint, open an investigation or take any other adverse action against an institution of higher education, or an entity acting on its behalf, an employee of an institution of higher education or a college student athlete for activity permitted under this article or for directly compensating a college student athlete for use of the college student athlete's name, image or likeness |
|---|---|---|---|
| South Carolina | S.C. Code Ann. § 59-158-40 | (C): An athletic association, an athletic conference, or any other group or organization with authority over an intercollegiate athletic program at an institution of higher learning to which this chapter applies may not:<br>(1): enforce a contract term, a rule, a regulation, a standard, a bylaw, guidance, or any other requirement that prohibits the institution from participating in intercollegiate sports or otherwise penalizes the institution, the institution's intercollegiate athletic program, or intercollegiate athletes for performing, participating in, or allowing an activity required or authorized by this chapter | (C): An athletic association, an athletic conference, or any other group or organization with authority over an intercollegiate athletic program at an institution of higher learning to which this chapter applies may not:<br>(1): enforce a contract term, a rule, a regulation, a standard, a bylaw, guidance, or any other requirement that prohibits the institution from participating in intercollegiate sports or otherwise penalizes the institution, the institution's intercollegiate athletic program, or intercollegiate athletes for performing, participating in, or allowing an activity required or authorized by this chapter |
| Tennessee | T.C.A. § 49-7-2801 *et seq*. | § 49-7-2802(a): An intercollegiate athlete may perform diligence and receive compensation related to the use of the intercollegiate athlete's name, image, or likeness, the intercollegiate athlete's enrollment at an institution, roster position with its athletics program, or any other categories of compensation available to or received by similarly situated intercollegiate athletes in interstate commerce.[3] | § 49-7-2802(b)(3): Regardless of the source of authority of an institution's athletic association pursuant to subdivisions (b)(1) or (b)(2), or any of its arrangements, agreements, contracts, transactions, settlements, or vote of any kind, the athletic association shall:<br>(D): Not directly or indirectly condition, threaten, lessen, refuse, remove, terminate, cancel, circumvent, penalize, disrupt, or |

---

[3] This provision is a grant of rights, not a prohibition, but it provides valuable context with respect to understanding § 49-7-2802(b)(3) and (b)(4) and § 49-7-2803(a).

APPENDIX A
Case No. 3:26-cv-05562

| | | | |
|---|---|---|---|
| | | (b)(3): Regardless of the source of authority of an institution's athletic association pursuant to subdivisions (b)(1) or (b)(2), or any of its arrangements, agreements, contracts, transactions, settlements, or vote of any kind, the athletic association shall:<br>(A): Preserve all rights[4] afforded to intercollegiate athletes under applicable state and federal law<br>(b)(4): An institution's athletic association shall not create or impose unfair, anticompetitive, or unlawful conditions that directly or indirectly compel an institution or intercollegiate athlete to participate under such conditions or risk violating state or federal law, regardless of whether a choice or option is made available by the association.<br><br>§ 49-7-2803(a): An institution's athletic association shall not:<br>(1) Interfere with, prohibit, restrict, or otherwise adversely affect an intercollegiate athlete's ability to earn compensation, seek representation, perform diligence, or otherwise participate in an activity described in § 49-7-2802 and shall not otherwise impact an intercollegiate athlete's eligibility or full participation in intercollegiate athletic events | otherwise interfere with, in any way or degree, an institution's full enjoyment of its current and future membership, status, or any related rights in the same, including, but not limited to, voting rights, participation in athletic events, broadcasts, revenue, or athlete eligibility based, in whole or part, on such association's failure to adhere to, uphold, or otherwise satisfy the requirements of this subdivision (b)(3) or any applicable law<br>(b)(4): An institution's athletic association shall not create or impose unfair, anticompetitive, or unlawful conditions that directly or indirectly compel an institution or intercollegiate athlete to participate under such conditions or risk violating state or federal law, regardless of whether a choice or option is made available by the association.<br><br>§ 49-7-2803(a): An institution's athletic association shall not:<br>(2) Interfere with, prohibit, restrict, or otherwise punish an institution and its affiliated foundation for participating in an activity described in § 49-7-2802 |
| Utah | U.C.A. 1953 § 53H-6-202 | (6): An athletic entity[5] may not:<br>(a): prevent a student athlete of an institution from fully participating in intercollegiate athletics because the student athlete:<br>• (i): earns compensation through the student athlete's name, image, or likeness | (6): An athletic entity may not:<br>(b): prevent an institution from becoming a member of an athletic entity or from participating in intercollegiate athletics that an athletic entity sponsors because a student athlete of an institution or college participating in intercollegiate athletics:<br>• (i): earns compensation from the use of the student |

---

[4] These include the right to earn NIL compensation set forth in Section 49-7-2802(a) of this statute.

[5] An "athletic entity" is defined in § 53H-6-201(2) of this statute as "an athletic association, athletic conference, or other group or organization with authority over intercollegiate athletics."

APPENDIX A
Case No. 3:26-cv-05562

| | | | athlete's name, image, or likeness |
|---|---|---|---|
| Virginia | Va. Code Ann. § 23.1-408.1 | (B): No institution or agent thereof, athletic association, athletic conference, or other organization with authority over intercollegiate athletics shall: (1): Prohibit or prevent a student-athlete from earning compensation for the use of his name, image, or likeness, except as otherwise permitted in this section (3): Declare a student-athlete ineligible for intercollegiate athletic competition because he earns compensation for the use of his name, image, or likeness or obtains professional representation by an athlete agent or attorney in connection with issues related to name, image, or likeness (4): Reduce, cancel, revoke, or not renew an athletic scholarship because a student-athlete earns compensation for the use of his name, image, or likeness or obtains professional representation by an athlete agent or attorney in connection with issues related to name, image, or likeness (C): No athletic association, athletic conference, or other organization with authority over intercollegiate athletics shall: (3): Penalize an institution or a student-athlete or prevent an institution or a student-athlete from participating in intercollegiate athletics because an individual or entity whose purpose includes supporting or benefiting the institution or student-athletes violates its rules or regulations concerning name, image, or likeness | (C): No athletic association, athletic conference, or other organization with authority over intercollegiate athletics shall: (1): Prohibit or prevent an institution from becoming a member of the association, conference, or organization or participating in intercollegiate athletics sponsored by such association, conference, or organization as a consequence of any student-athlete earning compensation for the use of his name, image, or likeness or obtaining representation by an athlete agent or attorney in connection with issues related to name, image, or likeness (2): Entertain a complaint, open an investigation, or take any other adverse action against an institution, its supporting foundations, or an entity acting on its behalf, for activity permitted under this section (3): Penalize an institution or a student-athlete or prevent an institution or a student-athlete from participating in intercollegiate athletics because an individual or entity whose purpose includes supporting or benefiting the institution or student-athletes violates its rules or regulations concerning name, image, or likeness |
| West Virginia | W. Va. Code § 18B-22-3 | (a): As a result of a student-athlete engaging in activities authorized by this article, no institution, athletic association, athletic conference, or other organization | (b): As a result of a student-athlete or an institution, an employee of an institution, an authorized agent of an institution, or an entity controlled by an |

APPENDIX A
Case No. 3:26-cv-05562

| | | with authority over intercollegiate athletics may:<br>(1): Open an investigation, penalize, suspend, take other adverse action, or declare a student-athlete ineligible from intercollegiate athletic competition<br>(2): Reduce, cancel, revoke, or not renew an athletic scholarship for a student-athlete | institution engaging in activities authorized by this article, no athletic association, athletic conference, or other organization with authority over intercollegiate athletics may open an investigation, penalize, suspend, or take other adverse action against any such person, institution, or entities for engaging in such activities. |
|---|---|---|---|

12
APPENDIX A
Case No. 3:26-cv-05562